UNITED STATES of America, Plaintiff–Appellee,

v.

**Louis CASTRO, Defendant–Appellant.**

No. 88–3803
Summary Calendar.

United States Court of Appeals, Fifth Circuit.

May 1, 1989.

Frank Sloan, Covington, La. (court appointed), for defendant-appellant.

Robert J. Boitmann, Walter Becker, Asst. U.S. Attys., John P. Volz, U.S. Atty., New Orleans, La., for plaintiff-appellee.

Before RUBIN, GARWOOD and DAVIS, Circuit Judges.

GARWOOD, Circuit Judge:

Defendant-appellant Louis Castro (Castro) appeals his conviction, following a jury trial, for the following offenses: (1) conspiracy to possess with intent to distribute approximately 450 kilograms of cocaine,[1] in violation of 21 U.S.C. § 841(a)(1) and § 846, (2) possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, (3) conspiracy to import cocaine, in violation of 21 U.S.C. § 952(a), § 960(a)(1), and § 963, (4) importation of cocaine, in violation of 21 U.S.C. § 952(a), § 960(a)(1), and 18 U.S.C. § 2, and (5) use of a firearm during the commission of a drug trafficking crime, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 924(c)(1). Concluding that Castro's contentions on appeal present no reversible error, we affirm.

### Facts and Proceedings Below

On May 18, 1988, Special Agent Ernie Stein (Stein) of the United States Customs Service was contacted by an informant who indicated that Castro was interested in leasing a vessel for the purpose of narcotics smuggling. After several days of negotiations between Castro and government informants, Castro leased a shrimp boat belonging to one of the informants. At approximately 1:30 a.m. on May 27, 1988, the vessel departed Delcambre, Louisiana and headed south into the Gulf of Mexico. On board were Castro, Customs Agent Michael J. Ciaurro, Jr. (Ciaurro), Customs Agent Frank Ferguson (Ferguson), and a confidential informant. Agent Ciaurro represented himself to be an employee of the boat owner. However, after two days Castro became suspicious of his passengers (especially Agent Ferguson) and turned back to Delcambre.

Shortly thereafter, an informant introduced Castro to Agent Stein, who posed as the owner of a crew boat that in reality was owned by the Customs Service. Castro agreed to lease this boat and on June 8, 1988, departed Crown Point, Louisiana, accompanied by Agents Stein and Ciaurro, as well as one Maurice Sudheimer (Sudheimer), a friend of Castro's. As "owner" of the boat, Agent Stein served as its captain. After several days, the vessel passed the Yucatan Peninsula and arrived in the area between the Nicaraguan and Colombian coasts. At this point, Castro, the only person aboard fluent in Spanish, contacted a "mother ship" by radio and received instructions from that ship as to where to meet it. However, Castro misunderstood these instructions. As a result, Castro and the agents failed to meet the mother ship and, shortly thereafter, decided to return to Louisiana. However, at this time the vessel developed engine trouble. The agents asked Castro about the possibility of having the boat repaired in the Cayman Islands, where they could also make arrangements for another attempt at picking up the cocaine from the mother ship. Castro agreed, and the vessel entered the Cayman Islands on June 15, 1988. Castro made several telephone calls and then advised the agents that the mother ship was still waiting. Castro also had several thousand dollars wired from the United States for expenses during this layover.[2]

On June 24, 1988, the agents and Castro departed the Cayman Islands to rendez-

---

1. The actual quantity was approximately 410 kilograms.

2. Meanwhile, the agents demanded that Sudheimer be put off the boat. While initially reluctant, Castro eventually agreed to send Sudheimer to New Orleans after he stole a woman's luggage and began "telling people he was doing a dope deal."

vous with the mother ship. They met the ship at approximately 6:00 p.m. on June 25, 1988, at a position located at approximately 16°N and 80°W, which was roughly 150 miles east of the Nicaragua/Honduras border. After transferring the cocaine from the mother ship to their vessel, the agents and Castro headed toward Louisiana. The vessel arrived in Lafitte, Louisiana at approximately 1:30 p.m. on June 28, 1988.[3] After the vessel arrived, Phyllis Stripling (Stripling), another Customs agent who pretended to be Agent Stein's wife, gave Stein twelve duffel bags, and Castro, Stein, and Ciaurro loaded the cocaine into ten of the bags. At approximately 3:00 p.m., Miguel Diaz (Diaz) and Alejandro Ramos (Ramos) returned to the offload site[4] and assisted Castro, Stein, and Ciaurro in unloading the duffel bags from the vessel and placing them into a nearby horse trailer.[5] After the unloading was complete, Diaz hooked the trailer to his truck and left the site. Ramos and Castro followed in Ramos' car. Agents Stein and Stripling remained at the loading site. Shortly afterward, Diaz, Ramos, and Castro were arrested. Diaz pleaded guilty to a lesser offense and cooperated with the government. Ramos was tried together with Castro and convicted on all counts.

### Discussion

On appeal, Castro raises only two points of alleged error. First, he contends that the prosecutor's closing remarks were improper. Second, he contends that the jury was not properly instructed regarding the presumption of innocence. We conclude that neither contention presents, singly or in combination, any reversible error.[6]

■ At trial, Castro objected to the prosecutor's closing remarks as inflammatory and not based upon the facts of this case. On appeal, Castro specifically cites three of these arguments:

> "Let's focus in on the families of the people in this district, the families who are going to have almost 950 to 1000 pounds of dope distributed in the streets."

> "He took a shot for greed like all these dope dealers do, both of them, and they lost, and it is time for you, I suggest, to send the message that we're not going to put up with it."

> "Whether it be Vacherie, Chalmette, or New Orleans, we don't want 950 to a thousand pounds of dope coming into this district. We are not going to put up with it."[7]

In *Whittington v. Estelle,* 704 F.2d 1418 (5th Cir.), *cert. denied sub nom. Whittington v. McKaskle,* 464 U.S. 983, 104 S.Ct. 428, 78 L.Ed.2d 361 (1983), we observed that there exists a "polyphonic interlude between an improper plea for conviction ... and a permissible plea for law enforcement." *Id.* at 1423.

In *United States v. Dorr,* 636 F.2d 117 (5th Cir.1981), we held that "[t]he test in determining the existence of prosecutorial misconduct regarding closing arguments is whether the remarks were improper and whether they prejudicially affected substantial rights of the defendants." *Id.* at

---

**3.** In the meantime, other government agents had installed a hidden, remote-controlled camera at the offload site, which enabled them to capture the offloading process on videotape.

**4.** Diaz and Ramos had been waiting at the site, but had departed to get something to eat.

**5.** Stein kept two of the duffel bags as security until Castro paid him for the use of "his" boat.

**6.** Also, on his docketing statement, Castro stated that he would challenge the constitutionality of the Sentencing Guidelines. No contention or argument in this regard is made in Castro's

brief (filed subsequently to the docketing statement). On the basis of the Supreme Court's decision in *Mistretta v. United States,* — U.S. ——, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989), and our holding in *United States v. White,* 869 F.2d 822, 825–26 (5th Cir.1989), we reject Castro's said constitutional challenge to the Guidelines.

**7.** We observe that Castro's brief leaves out relevant portions of the complained of remarks. For instance, regarding the "[l]et's focus on the families" comment, only two sentences later the prosecutor stated that "the Judge will charge you that sympathy, bias or prejudice is not to be part of your verdict."

120.[8] However, if we determine that the prosecutor's remarks did not prejudically affect a defendant's substantial rights, such remarks do not constitute reversible error and it is not necessary to reach the question of their propriety. *United States v. Phillips,* 664 F.2d 971, 1030 (5th Cir. 1981), *cert. denied sub nom. Meinster v. United States,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). This is such a case. Unlike the situation in *Dorr,* where the defendant's explanation of his conduct was plausible and where his conviction rested almost solely upon the testimony of a co-defendant turned government's evidence, in the current case the evidence against Castro is simply overwhelming. Government agents accompanied him throughout the entire drug retrieval voyage, which lasted almost three weeks. Once Castro returned to Louisiana, Castro's activities during the unloading process were recorded on both audio and video tape. What we said of the complained of argument in *United States v. Canales,* 744 F.2d 413 (5th Cir.1984), is likewise applicable to the argument here, *viz:* "Even if the argument did go beyond the proper limits of a plea for law enforcement or an appeal to the jury to act as the conscience of the community, it did not do so egregiously," *Id.* at 430. It is true that in *Canales* the objection was sustained and a proper instruction given, while here the objection was overruled. But in *Canales,* "the proof of guilt was not overwhelming,"

*id.* at 433, so the appropriateness of the trial court's response to the objection was crucial; here, on the other hand, the defense presented no evidence (unlike *Canales,* where "the testimony was in sharp conflict," *id.* at 421), and the evidence of Castro's guilt was overwhelming.[9]

■ Castro's second contention is that the district court failed to adequately instruct the jury regarding the presumption of innocence. No objection (or request) in this respect was made at trial. In support of his argument on appeal, Castro cites this Court's recent decision in *United States v. Walker,* 861 F.2d 810 (5th Cir.1988), which criticized the Pattern Jury Instructions on which the complained of instruction in the present case was based.[10] *Id.* at 812–13. Although *Walker,* which was handed down after trial herein was completed, specifically stated that "the [Pattern Jury Instruction regarding presumption of innocence] did not explain the presumption in clear enough terms to absolutely assure the jurors' understanding," the court affirmed Walker's conviction, stating that "the instruction was sufficient." *Id.* at 814. We hold that the instruction was sufficient here as well. Not only did the district court instruct the jury on the presumption of innocence at the close of the trial, but the court also stressed the presumption of innocence on numerous occasions in other phases of the proceedings. For example, the court, during voir dire, the charge in this respect presents no reversible error.

**8.** Castro's counsel made a sufficient contemporaneous objection and therefore the plain error rule is not applicable. *Dorr,* 636 F.2d at 120.

**9.** Furthermore, the government contends that the prosecutor's statements about the "families of the people in this district" was merely an "invited response" to the arguments of defense counsel. Since the closing argument referring to the family of co-defendant Ramos was made by Ramos' lawyer (Castro's lawyer referred to his family only in his opening statement), this could present a question whether the invited response by the government to one co-defendant's attorney should operate against the other co-defendant. However, we need not reach this question. Even if the prosecutor's remarks "exceeded permissible bounds and defense counsel raised a timely objection, a reviewing court could reverse an otherwise proper conviction

only after concluding that the error was not harmless." *United States v. Young,* 470 U.S. 1, 105 S.Ct. 1038, 1045 n. 10, 84 L.Ed.2d 1 (1985). In light of the overwhelming evidence against Castro, the complained of argument does not constitute reversible error.

**10.** The instruction given here stated

"I remind you that the indictment is merely the formal charge against the defendants; it is not evidence of guilt. Indeed, the defendants are presumed to be innocent. The law does not require a defendant to prove innocence or produce any evidence at all, and no inference whatever may be drawn from the election of a defendant not to testify.

"The government has the burden of proving a defendant's guilt beyond a reasonable doubt, and if it fails to do that, you must acquit that defendant."

For the foregoing reasons, the judgment of the district court is

AFFIRMED.