**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**William STEWART, Sr., Mario Hennington, and Eddie Walker,
Defendants–Appellants.**

No. 88–3836
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

July 31, 1989.

James H. Looney, (Court-appointed), Covington, La., for Stewart.

Frank Sloan, Covington, La., for Hennington.

Dwight Doskey, (Court-appointed), Cherbonnier, Ohlmeyer & Doskey, Harvey, La., for Walker.

Robert J. Boitmann, Marilyn Gainey Barnes, Asst. U.S. Attys., John P. Volz, U.S. Atty., New Orleans, for U.S.

Before GARWOOD, JOLLY and DAVIS, Circuit Judges.

GARWOOD, Circuit Judge:

Defendants-appellants William Stewart, Sr. (Stewart, Sr.), Mario Hennington (Hennington), and Eddie Walker (Walker) appeal their convictions and/or sentences arising from their roles in a conspiracy to distribute cocaine and/or phencyclidine (PCP). None of the appellants challenge the sufficiency of the evidence to support their convictions. Stewart asserts only that the trial court's instruction on the presumption of innocence was inadequate. Hennington also makes that same complaint and, in addition, asserts that two instances of alleged prosecutorial misconduct entitle him to, a new trial. Walker complains only of his sentence. We reject these contentions and affirm.

## Facts and Proceedings Below

The appellants were part of a larger cast of characters. Stewart, Sr. is the father of William "Lou" Stewart, Jr. (Lou) and Quentin "Stoney" Stewart (Quentin). Lou lived with Hennington's sister, Crystal Hennington (Crystal). Other participants included Lou's cousin Earl Stewart, Jr. (Earl), his girlfriend Adrienne Melancon (Melancon), Isaac Jefferson (Jefferson), Thaddeus Fouche (Fouche), Isaac Thomas (Thomas), Kevin Griffin (Griffin), and Don Williams (Williams).

In 1986, Quentin was the ringleader of an operation that transported cocaine and PCP from Los Angeles to New Orleans. However, in May 1986, Quentin was arrested and leadership of the operation passed to Lou.[1] By March 1987, Lou had developed a system by which drugs were either flown or driven into New Orleans by couriers. Once there, the drugs were transferred to other dealers or sold on the street out of several houses in New Orleans' Ninth Ward area. On May 30, 1987, Fouche and another courier were arrested in the New Orleans International Airport. In their possession at the time of arrest were two suitcases filled with several gallons of PCP, as well as a substantial quantity of cocaine. Confronted with this evidence, Fouche agreed to cooperate with the government. He informed the government —and later testified at trial—that he had picked up the drugs at the residence of Stewart, Sr., where the drug packages had been prepared for shipment.

Pursuing the leads obtained from Fouche, Drug Enforcement Administration (DEA) agents obtained authorization to utilize pen registers and wiretaps to monitor conversations between the Stewarts and their associates. On November 11, 1987, agents learned that cocaine was to be delivered to Earl's residence in New Orleans. The agents obtained a search warrant for this residence, seized approximately 975 grams of cocaine, and arrested Earl and Melancon. This cocaine had been hidden in a spare tire and transported from Los Angeles to New Orleans by Walker. A short time later, government agents arrested the remaining participants. Lou, Crystal, Earl, Melancon, and Griffin all pleaded guilty to various drug offenses on February 26, 1988, and were sentenced on June 22, 1988. Jefferson, Fouche, and Thomas also entered guilty pleas for offenses relating to the conspiracy.[2]

The three appellants were charged in a five-count superseding indictment issued June 16, 1988. Count One alleged that Stewart, Sr., Hennington, and Walker all conspired, between March 1, 1987 and November 27, 1987, to possess with intent to distribute over five hundred grams of cocaine. Count Two charged Stewart, Sr. and Hennington with conspiracy to possess with intent to distribute over one hundred grams of PCP during this same period. Counts Three and Four, involving only Stewart, Sr., charged that he possessed with intent to distribute cocaine and PCP between May 29 and 30, 1987. The cocaine and PCP referenced in Counts Three and Four was that picked up at Stewart, Sr.'s residence by Fouche before his ill-fated journey to New Orleans on May 30, 1987. Count Five charged Walker with posses-

---

1. Quentin pleaded guilty to various drug offenses and was sentenced to fifty-four months in prison.

2. Of these participants in the scheme, only Lou, the ringleader, received a lengthy sentence.

sion with intent to distribute over five hundred grams of cocaine. The cocaine referenced in Count Five was that seized at Earl's residence in New Orleans on November 11, 1987. After a trial lasting several days, the jury returned a verdict of guilty against all defendants on all counts. This appeal followed.

### Discussion

We consider Hennington's, Stewart's, and Walker's contentions in that order.

### I. *Hennington: Prosecutorial Misconduct*

Hennington, like Fouche and several of the other participants, served as a courier. At trial, he admitted that he had made numerous trips from Los Angeles to New Orleans during the period in question. However, he emphatically denied that he had ever transported drugs and maintained that each trip was for purely social reasons (primarily to see his sister, Crystal, who lived with Lou in New Orleans). The government, while conceding that Hennington was not in possession of drugs at the time of his arrest, produced three witnesses who testified that Hennington was involved in the movement of cocaine and PCP. The testimony of these witnesses, combined with circumstantial evidence, formed the basis of the government's case.[3]

Hennington took the stand in his own defense. The essential thrust of his testimony was that the prosecution's witnesses had lied, and that he was a law-abiding citizen with no motive to deal in drugs. He continued to assert that he made the trips to New Orleans to visit Crystal and other relatives. Hennington's father, Noblin Hennington (Noblin), also testified in support of his son. He testified that he had supervised Hennington strictly after a California conviction, and subsequent sentence of probation, for cocaine possession, and that Hennington was not involved in drugs because Noblin would have been aware of such activity and would have taken action to stop it.[4]

 The alleged prosecutorial misconduct is based upon the Assistant United States Attorney's cross examination of Hennington. In this cross examination, the government produced two controversial items. The first was a tape-recorded conversation between Hennington and Crystal. In this conversation, which occurred on November 7, 1987, Hennington discussed a recent arrest and his use of the alias "Robert Montgomery" in that respect. Hennington's attorney objected to the mention of the arrest. This objection was sustained by the district court, which also issued a cautionary instruction to the jury. The court, however, denied Hennington's motion for a mistrial. The second instance of alleged misconduct was the prosecutor's questions concerning a notebook/diary, kept by Crystal, in which the prosecutor asked Hennington, "Do you know why your sister would write in her notebook one of her aims for the year was to get Mario [Hennington] to stop making his trips."[5] As with the November 1987 arrest, Hennington's attorney properly objected to the introduction of the notebook and requested a cautionary instruction. After further argument, Hennington's counsel repeated his

---

**3.** Jefferson testified that he had met Hennington on several occasions to pick up the drugs brought by Hennington from Los Angeles. His testimony also detailed the exact location where he had met Hennington and described the type and amount of drugs transported on each trip. Fouche testified that he and Hennington had alternated as drug couriers, and that he, Fouche, had been recruited into the scheme by Hennington.

**4.** The government introduced records that Hennington had pleaded guilty in a California state court to a charge of cocaine possession. The offense was committed May 16, 1986. On July

30, 1987, Hennington was placed on probation pursuant to his conviction for this offense. One of the terms of this probation was that Hennington submit to regular urine sample drug tests. This evidence, as well as the fact that Hennington later failed the first of these tests, is undisputed and its introduction uncontested.

**5.** Hennington answered "no." He also said, "I haven't seen it before" when the prosecutor showed him the purported docment. Unlike the tape-recorded conversation, the government did not introduce the notebook into evidence.

objection, but did not repeat his request for a cautionary instruction. The trial court then said, "I sustained the objection." No further request for a cautionary instruction was made, nor was any motion for mistrial ever made in this respect. Thereafter, neither side pursued the matter any further.

Hennington concedes, as he must, that to warrant a new trial, prosecutorial misconduct "must be so pronounced and persistent that it permeates the entire atmosphere of the trial." *United States v. Blevins*, 555 F.2d 1236, 1240 (5th Cir.1977), *cert. denied*, 434 U.S. 1016, 98 S.Ct. 733, 54 L.Ed.2d 761 (1978). In *United States v. Lichenstein*, 610 F.2d 1272 (5th Cir.), *cert. denied sub nom. Bella v. United States*, 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 856 (1980), we observed that "[t]his court condemns prosecutorial attempts to influence a jury improperly by reference to more flamboyant, but extrinsic and unproved, activities of defendants." *Id.* at 1282. Nevertheless, we held that "in light of the relatively strong evidence of guilt ..., coupled with the [district] court's curative instructions, ... [the alleged misconduct did not taint] the proceedings to a degree requiring the grant of a new trial." *Id.* We reach the same conclusion here. Contrary to Hennington's claim that his was a close case, the evidence of his guilt is strong indeed. Several eyewitnesses testified that Hennington had made numerous trips to New Orleans carrying drugs. The circumstantial evidence against Hennington is also strong, and Hennington's own testimony contains numerous self-contradictions. For instance, Hennington denied using the alias "Robert Montgomery" but later admitted that he had, in fact, used that false name; and Hennington's claim that he made the trips to New Orleans primarily to visit Crystal was contradicted by the fact that he often stayed in a motel because he found Crystal's residence "boring." Hennington also contradicted his (and Noblin's)

claim that Noblin supervised him strictly, for on several occasions he stated that his parents often did not know he had gone to New Orleans. While use of the conversation recorded on November 7, 1987 and the mention of Crystal's notebook may have been improper, the strength of the government's case, combined with the district court's sustaining the objections made, its curative instruction regarding the arrest, and the context of and lack of complaint respecting its ruling on the notebook, lead us to conclude that the cumulative effect of these two instances over the course of a five-day trial was at most very slight and that the error, if any, was harmless.[6]

## II. *Hennington and Stewart, Sr.: Presumption of Innocence*

Both Hennington and Stewart, Sr. contend that the jury instruction on the presumption of innocence was inadequate. The jury instruction in this case was taken from the Fifth Circuit Pattern Jury Instructions. No objection was made to this instruction at trial. Although we have, in one recent opinion, *questioned* the adequacy of the Pattern Jury Instruction regarding the presumption of innocence (*United States v. Walker*, 861 F.2d 810 (5th Cir. 1988)), we have never reversed a conviction on this basis, including that of *Walker*, where we held that the unobjected to use of the questioned instruction did not constitute plain error and thus affirmed the defendant's conviction. *Id.* at 812–13. In *United States v. Castro*, 874 F.2d 230 (5th Cir.1989), we again held that the unobjected to use of the Pattern Jury Instruction on the presumption of innocence did not constitute plain error so as to authorize reversal. *Id.* at 233.[7] We follow the *Castro* decision here.

## III. *Walker: Sentencing*

■ Finally, we address Walker's claim

---

6. This conclusion is strengthened by the fact that the evidence showed that Hennington had been convicted of possessing cocaine in May 1986 and that he had failed a drug test after July 30, 1987, a period during which he claimed to be clean and sober. Such evidence in itself would be more than sufficient to allow a jury to conclude that Hennington's involvement with drugs had continued.

7. We have never actually held, or even unequivocally stated, that this particular instruction is erroneous.

that his ten-year sentence is excessive.[8] It was determined—concededly properly—that Walker was a second narcotics offender under the provisions of 21 U.S.C. § 851. Since this was the case, 21 U.S.C. § 841(b)(1)(B)(ii)(II) required that a minimum sentence of ten years be imposed. However, it is undisputed that (at least *apart* from the minimum sentence provision of § 841(b)(1)(B)(ii)(II)) the Sentencing Guidelines range for Walker's offense and criminal history called for a sentence of fifty-seven to seventy-one months. Walker contends that the Sentencing Guidelines implicitly repealed statutes such as § 841(b)(1)(B)(ii)(II) and that he thus should have been sentenced to the lesser term specified by the guidelines. This is the sole basis on which Walker makes his complaint respecting his sentence.

We reject Walker's argument. It is well settled that repeals by implication are not favored. *E.g., Tennessee Valley Authority v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). In *Rodriquez v. United States,* 480 U.S. 522, 107 S.Ct. 1391, 94 L.Ed.2d 533 (1987), the Supreme Court was confronted with an analogous issue. 18 U.S.C. § 3147 requires that anyone who commits a felony while on probation be sentenced to at least two years in prison. However, the Probation Act, 18 U.S.C. § 3651 permits federal judges to suspend certain sentences and impose probation. In *Rodriquez,* the government contended that the former provision had implicitly repealed the latter and that district courts could no longer place defendants on probation who were sentenced under section 3147. *Id.* 107 S.Ct. at 1391–92. The Supreme Court rejected this argument and held that "[n]ei-

ther the language nor the legislative history of § 3147 provides any basis for concluding that it was intended to effect a partial repeal of § 3651." *Id.* at 1393. We follow the *Rodriquez* rationale here. There is nothing in the language of the guidelines to imply a repeal of other sentencing statutes. In fact, the guidelines speak to the contrary. Section 5G1.1(b) states that "[i]f application of the guidelines results in a sentence below the minimum sentence required by statute, the statutory minimum shall be the guideline sentence." As Walker received the statutory minimum, he received the guideline sentence.[9]

For the foregoing reasons, the claims of reversible error of each appellant are rejected and accordingly the judgment of the district court is

AFFIRMED.

---

8. Walker was sentenced to ten years on Count Five and to a concurrent five-year term on Count One.

9. We also decline to grant Hennington relief on the basis of the assertion, made solely on his docketing statement, that his sentence is illegal because "[t]he Guidelines should not apply to a conspiracy begun prior to the specific date of the Guidelines." The docketing statement gives no further elaboration whatever of this assertion. In Hennington's appellant's brief, filed several months after the docketing statement, no complaint whatever is made in respect to his sentence or the use of the guidelines (nor is

there any reference to the docketing statement). It would appear that Hennington (who has been represented by counsel at all stages) has abandoned this matter. Moreover, in *United States v. Baresh,* 790 F.2d 392 (5th Cir.1986), we observed that conspiracy is a *continuing* crime, and that "a statute increasing the penalty for a conspiracy beginning before the date of enactment but continuing afterwards does not offend the Constitution." *Id.* at 404. The conspiracy in the instant case, as alleged in the indictment and shown by the evidence, continued well past November 1, 1987, the effective date of the sentencing guidelines.