IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-30071
Summary Calendar
_____


UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

     versus

LOUIS CASTRO,

                                        Defendant-Appellant.


_____

Appeal from the United States District Court for the
Eastern District of Louisiana
(95-CA-3342-H)
_____
December 3, 1996

Before GARWOOD, JOLLY and DENNIS, Circuit Judges.[*]

GARWOOD, Circuit Judge:

     Louis Castro (Castro) appeals, *pro se* and *in forma pauperis*,
the denial of his motion for post-conviction relief pursuant to 28
U.S.C. § 2255.  Castro challenges the sentence imposed by the
district court as an improper application of an as-yet-to-be-
enacted conspiracy statute constituting an *ex post facto* violation,
as the result of ineffective assistance of his trial counsel, as

---

[*]     Pursuant to Local Rule 47.5, the Court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in Local Rule 47.5.4.

the result of the admission of "tainted" evidence at his trial, and, finally, as unsupported by the terms of 18 U.S.C. § 941(c)(1) as interpreted in *Bailey v. United States*, 116 S.Ct. 501 (1995). The district court, after deleting the supervised release provisions on two counts, denied Castro's section 2255 motion. For the following reasons, we affirm.

### Facts and Proceedings Below

Because the merits of Castro's claims depend, in significant part, on the factual record developed during his trial, we present the background facts in some detail.[1]

Castro's conviction arose from the second of two bungled attempts to import cocaine into the United States by boat from a "mother ship" off the coast of Colombia.

Castro's first attempt, in May 1988, was the result of an endeavor facilitated by undercover agents and confidential informants of the United States Customs Service. On May 18, 1988, Special Agent Ernie Stein (Stein) learned through an informant that Castro desired to lease a boat to smuggle narcotics into the country by sea. Subsequent negotiations between Castro and government informants led to the lease of a shrimp boat to Castro owned by one of the informants. The boat left Delcambre, Louisiana, at 1:30 a.m. on May 27, 1988. The "crew" onboard

---

[1] The facts underlying Castro's conviction are set forth in *United States v. Castro*, 874 F.2d 230 (5th Cir.), *cert. denied*, 110 S.Ct. 138 (1989).

consisted of Castro, undercover Customs Agent Michael J. Ciaurro, Jr. (Ciaurro), undercover Customs Agent Frank Ferguson (Ferguson), and a confidential government informant. Shortly after the boat reached the Gulf of Mexico, Castro apparently became suspicious of his shipmates, terminated their mission, and returned to Delcambre.

Castro's second attempt, though leading to his ultimate demise, proved more successful. After an introduction to Agent Stein (posing as the owner of a "crew boat" actually owned by the Customs Service), Castro agreed to lease the boat for his run. On June 8, 1988, the second team departed Crown Point, Louisiana. Onboard were Castro, Castro's friend Maurice Sudheimer (Sudheimer), undercover Agent Stein, and undercover Agent Ciaurro. Several days into the voyage, the vessel passed the Yucatan Peninsula and arrived in the area between the Nicaraguan and Colombian coasts. Castro, the only "crew member" to speak Spanish, contacted the "mother ship" by radio, receiving directions to the location of the transfer. Castro, a nautical neophyte, misunderstood the instructions, apparently confusing the "Rusario Banks," closer to Nicaragua, with the "Roslyn Banks," closer to Colombia. As a result, the planned open-ocean rendezvous was frustrated. Apparently giving up on the endeavor, Castro and his "partners" decided to return to Louisiana.

To add insult to a rather injurious trip, the vessel soon developed engine trouble. The agents suggested to Castro that the boat be repaired in the Cayman Islands, where they could also make

3

arrangements for yet another attempt to rendezvous with the "mother ship." Castro agreed. When the vessel entered the Cayman Islands on June 15, 1988, Castro arranged another meeting with the "mother ship" and also arranged for a wire transfer of funds from Miami for the repair expenses.[2] In the meantime, Sudheimer "had some difficulties" when he stole a woman's luggage and "advis[ed] everybody in the Grand Caymans . . . he was doing a dope deal." The agents suggested, and Castro reluctantly agreed, that sending Sudheimer back to New Orleans was in the operation's best interests. Castro, who was noticeably uncomfortable after Sudheimer's departure, demanded that Agent Stein return to him the gun he had brought onboard the vessel. Stein complied.[3] Castro kept the weapon on his person for most of the remainder of the voyage.

On the evening of June 24, 1988, the original crew—minus Sudheimer—left the Cayman Islands to rendezvous with the "mother ship." This time Castro was able to direct the vessel to the proper meeting place, an area roughly 150 miles east of the Nicaragua/Honduras border referred to as the "Northeast Breakers"

---

[2]    Castro noticed Agent Stein making several calls on a "government credit card" while in the Cayman Islands. When asked by Castro why he was using the card, Agent Stein replied that it was a "tax write off" for his company. Both Castro and Sudheimer subsequently made calls on Agent Stein's government phone card.

[3]    Before informing Castro where his gun had been hidden on the vessel, Agent Stein clipped part of the firing pin off the weapon. At trial Castro stipulated that the weapon was a "firearm" as defined by 18 U.S.C. § 921(a)(3).

4

at the "Scenario Banks." The offload with the Colombian vessel was successful, transferring 410 one-kilogram packages of cocaine.

The vessel arrived in Lafitte, Louisiana, on June 28, 1988. Special Agent Phyllis Stripling (Stripling), posing as Agent Stein's wife, met the returning vessel with twelve "military-type duffel bags" for the offload. The offload area was videotaped by a Customs Service camera mounted on a telephone pole across the street from the offload site and was recorded on audio tape through the use of a "beeper" passed to Agent Stein by his "wife" Agent Stripling that was actually a transmitter. Miguel Diaz (Diaz) and Alejandro Ramos (Ramos), Castro's confederates, missed the arrival of the vessel because they had decided to get lunch. Castro, Agent Stein, and Agent Ciaurro loaded the cocaine packages into the duffel bags on the vessel. Ramos and Diaz returned to the offload area approximately an hour and a half later and helped load eight duffel bags onto a horse trailer. Agent Stein kept two duffel bags (100 one-kilogram packages) onboard the vessel as a type of "earnest money" for the $1.5 million promised by Castro for his assistance.[4]

Diaz left the scene in a truck pulling the cocaine-laden horse trailer. Castro followed in Ramos's vehicle. The horse trailer

---

[4]    The plan, apparently, was for the participants to load the duffel bags into three cars and drive to Castro's residence in Miami. Upon arrival at Castro's residence, Agent Stein and his "wife" Agent Stripling would be given keys to a fourth car containing the $1.5 million.

was subsequently stopped; Castro, Ramos, and Diaz were arrested; and the trailer and Ramos's vehicle were brought to the Drug Enforcement Agency (DEA) office in New Orleans. Agents Stein and Stripling went directly to the U.S. Attorney's office and drew up an affidavit for a search warrant for the horse trailer.

DEA agents conducted the search of the trailer and, after securing the vehicles in the Customs Service office in New Orleans and weighing the cocaine packages, informed Agents Stein and Stripling the next morning that they had accounted for 409 one-kilogram packages. Realizing a kilogram of cocaine was missing, the Customs agents went to the vehicles at the Customs office and searched Ramos's vehicle.[5] The search of Ramos's trunk yielded the weapon that Agent Coleman had placed there the night of the arrests and Castro's luggage. In Castro's luggage Agents Stein and Stripling found Castro's weapon, a box of bullets, and a one-kilogram package of cocaine wrapped in his clothing.

On July 26, 1988, roughly a month after the arrests of the Castro gang, Diaz was permitted to plead guilty to the lesser offense of conspiring to possess with intent to distribute 500 grams or more of cocaine, 21 U.S.C. § 846, in return for his

---

[5] The night of the arrests, Special Agent Richard Coleman (Coleman) secured the vehicle in the Customs building. Later that night, Coleman learned from other agents that a firearm may have been left in the vehicle. The following morning, at approximately 7:00 a.m., Coleman returned to the vehicle, located a handgun under the front seat, and placed it in the trunk. Coleman testified that he neither searched the trunk nor observed its contents.

assistance and testimony before the grand jury and at trial.

Ramos and Castro were tried together. On August 9, 1988, after a two-day jury trial, Castro was convicted of the following offenses: (1) conspiracy to possess with intent to distribute approximately 450 kilograms of cocaine,[6] in violation of 21 U.S.C. §§ 841(a)(1) & 846, (2) possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, (3) conspiracy to import cocaine, in violation of 21 U.S.C. §§ 952(a), 960(a)(1), & 963, (4) importation of cocaine, in violation of 21 U.S.C. §§ 952(a) & 960(a)(1) and 18 U.S.C. § 2, and (5) using or carrying a firearm during the commission of a drug trafficking crime, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. 924(c)(1). On October 19, 1988, Castro was sentenced to four concurrent life imprisonment terms for counts one through four to run consecutive to a sentence imposed in a prior Florida case and a five-year imprisonment term for count five to run consecutively to counts one through four. In addition, terms of supervised release were imposed.

Castro's conviction and sentence were affirmed by this Court on May 1, 1989. *United States v. Castro*, 874 F.2d 230 (5th Cir.), *cert. denied*, 110 S.Ct. 138 (1989).

On October 11, 1995, Castro filed this motion to vacate his sentence under the federal habeas substitute, 28 U.S.C. § 2255.

---

[6] As discussed above, the actual amount was 410 kilograms.

7

Castro raised four issues.  First, he argued that the district court erred when it sentenced him to life imprisonment without parole for counts one through four of the indictment.  Second, he argued that the sentencing court applied the amended federal conspiracy statute providing for mandatory minimums in connection with his conspiracy conviction, constituting an *ex post facto* violation.  Third, he argued that the firearm used to support his conviction under count five was "tainted by government abuse." Finally, Castro proffered an ineffective assistance of counsel claim.

On December 11, 1995, the district court denied all of Castro's claims with the exception of the imposition of five-year supervised release terms in connection with counts one and three. Citing *Bifulco v. United States*, 100 S.Ct. 2247 (1980), the district court held that a special parole term cannot be imposed when a statute provides for punishment only by imprisonment or fine or both.  Accordingly, Castro's sentence was amended to delete the supervised release terms imposed on counts one and three.[7]  Castro appeals the district court's denial of his section 2255 motion to vacate repeating his claims below and adding a claim that his conviction on count five, using or carrying a firearm during and in relation to a drug trafficking crime, was improper after the

---

[7] Neither party challenges this action by the district court on appeal.

Supreme Court's decision in *Bailey*, 116 S.Ct. 510.

## Discussion

### I.

Castro first claims that the district court erred when it sentenced him to life imprisonment for counts one through four of the indictment, arguing that the district court relied upon conspiracy statutes that became effective after the date of his offenses. The statutes Castro argues were used by the district court were the amended versions of 21 U.S.C. §§ 846 & 963, referenced in counts one and three, respectively. Castro contends that the district court committed an *ex post facto* violation by sentencing him under the unenacted statutes.

We first note that Castro did not raise this claim on direct appeal and, accordingly, must demonstrate both cause and prejudice for his failure to do so. *See United States v. Frady*, 102 S.Ct. 1584, 1594 (1982). "[T]he proper standard for review [of a 2255] motion is the 'cause and actual prejudice' standard enunciated in *Davis v. United States*, 93 S.Ct. 1577 (1973), and later confirmed and extended in *Francis v. Henderson*, 96 S.Ct. 1708 (1976), and *Wainwright v. Sykes*, 97 S.Ct. 2497 (1977)." *Frady*, 102 S.Ct. at 1594. That Castro purports to raise a constitutional claim does not shield him from the obligation to demonstrate cause and prejudice. *United States v. Placente*, 81 F.3d 555, 558 (5th Cir. 1996) ("[A] defendant who raises a constitutional or jurisdictional

9

issue for the first time on collateral review must show both cause for his procedural default and actual prejudice due to any such errors."). As Castro offers no explanation for his failure to address this claim on direct appeal, he has forfeited the ability to assert it before this tribunal.

Even were we to assume that Castro presented a cognizable claim, we would find it to be meritless. Castro was sentenced October 19, 1988. Castro is correct in his contention that the federal conspiracy statutes were amended, effective November 18, 1988, to provide for the "same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." *See* 21 U.S.C. § 846 (West Supp. 1996); *id.* § 963 (West Supp. 1996). Similarly, Castro correctly observes that, as amended, the federal conspiracy statutes would call for mandatory minimum sentences today for the offenses he committed in June of 1988.[8] Castro, however, is simply mistaken when he asserts that the sentencing judge referenced mandatory minimums during his sentencing.

Castro's Presentence Report, prepared by the United States Probation Office, provided, in pertinent part:

---

[8] 21 U.S.C. § 846 and 21 U.S.C. § 963, by causing a conspirator to be subject to the same penalties as those provided for the underlying offense, make any mandatory minimum sentences applicable to the underlying offense equally applicable to the conspiracy offense. In Castro's case, the underlying offenses of his conspiracy convictions provide for mandatory minimums. *See* 21 U.S.C. § 841(b); 21 U.S.C. § 960.

10

"Part C.   Sentencing Options
. . . .
27.   Statutory Provisions: Counts 1 and 3 carry a maximum trm [sic] of life, with no minimum mandatory - Title 21 USC, 846 and 963.   Counts 2 and 4 carry a mandatory minimum sentence of ten years and a maximum sentence of life - Title 21, USC, Sections 841(a)(1) and 952(a).   Count 5 is a five year consecutive sentence."

Presentence Report ¶ 27.   Although there is no transcription of Castro's sentencing hearing in the record, the sentencing judge's "Statement of Reasons for Imposing Sentence" contains no mention of mandatory minimums for counts one through four and Castro fails to offer any proof that the judge in fact used the wrong statute.[9]   In rejecting his section 2255 motion, the district court, who had sentenced Castro, expressly noted that the conspiracy counts had not been sentenced on the basis of mandatory minimums.   Castro's claim in this respect is without merit.

## II.

Castro next contends that he received ineffective assistance of counsel.   Ineffective assistance claims are reviewed under the two-pronged test set forth in *Strickland v. Washington*, 104 S.Ct.

---

[9]   Castro's repeated citation of *United States v. Rush*, 874 F.2d 1513 (11th Cir. 1989), is not persuasive.   In *Rush*, the trial court mistakenly determined that the *pre-amendment* version of 21 U.S.C. § 963 required the imposition of the mandatory terms of 21 U.S.C. § 960.   *Id.* at 1514.   This, of course, was not the law.   *See United States v. Brown*, 887 F.2d 537, 541 (5th Cir. 1989) (remanding for resentencing where trial court incorporated the mandatory minimum sentence of § 841(b)(1) into § 846 prior to the 1988 amendments).   Castro, however, offers only his own speculation to discredit the abundance of contrary indications that the district court did not consider the offenses to carry mandatory minimums.

11

2052 (1984). Castro must first demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 2064. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* Next, Castro must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 2068. Both *Strickland* prongs must be satisfied to obtain relief on an ineffective assistance of counsel claim. *See id.; Bridge v. Lynaugh*, 838 F.2d 770, 773 (5th Cir. 1988). In applying the *Strickland* test, we must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional competence." *Bridge*, 838 F.2d at 773.

Castro describes several events from his trial that he contends establish his ineffective assistance of counsel claim. First, Castro states that he received a "replacement counsel" the morning of his trial and that counsel's failure to seek a continuance prejudiced his trial. Second, Castro asserts that no pre-trial motions were made by either counsel assigned to represent him. Finally, Castro believes that the quality of cross-examination of several witnesses amounts to constitutional error. Castro's claim is without merit.

First, as the district court observed in its denial of

12

Castro's claim, Arthur Huttoe (Huttoe) was simply not "[a]ppointed thirty minutes before opening arguments," but rather served as Castro's attorney "from the beginning of the case and represented Castro on numerous occasions prior to trial," *United States v. Castro*, No. 88-371, at 5 (E.D. La. 1995). A review of the record demonstrates the speciousness of Castro's claim.

Rather than a "replacement lawyer" introduced to the case the morning of trial, attorney Huttoe was Castro's attorney from at least June 30, 1988, and remained so for the duration of the case. Although attorney Frank Sloan (Sloan) was retained as local counsel,[10] the record makes clear that the principal attorney in the case from its commencement was Huttoe. Huttoe filed a motion to continue Castro's detention hearing on June 30, 1988——one day after his arrest. Huttoe was present at Castro's detention hearing on July 5, 1988. On July 8, 1988, Sloan filed a motion to permit Castro to use the phone to contact Huttoe, describing Huttoe as "lead counsel." Huttoe was listed on the "routing slip" for all papers filed with the court. The morning of trial, the colloquy between the district judge, Huttoe, and Sloan makes clear that Huttoe was substantially involved with the case well prior to trial.[11] Sloan, as local counsel, had consistently understood that

---

[10]     Huttoe's law offices were located in Miami, Florida.

[11]     Sloan, as local counsel, submitted a motion for Huttoe to appear *pro hac vice* before the district court the morning of trial—the event that Castro confuses with "appointment." Although

13

"Mr. Huttoe would try the case if it went to trial." Apparently Castro also understood this quite clearly, stating that he had no objection to Huttoe conducting his defense alone.[12]

As to Castro's second claim, in addition to the pretrial motions discussed above, Sloan received impeachment information which the government disclosed pursuant to *Giglio v. United States*, 92 S.Ct. 763 (1972). As the district court observed, Castro's claim that "counsel failed to either investigate the facts and issues or seek discovery ignores the fact that such crucial discovery materials were provided to defense counsel." *United States v. Castro*, No. 88-371, at 5.[13]

In light of our review of the record, it is quite clear that Castro has failed to present any factual basis to support his

Huttoe made appearances on Castro's behalf prior to the *pro hac vice* motion, we agree with the district court that "he had no business doing that." Neither the district court's exasperation with the tardiness of the *pro hac vice* motion nor the unauthorized practice of law before the magistrate judge during pretrial proceedings, however, bear on the merits of Castro's defense.

[12] Sloan had requested that Huttoe be permitted to try the case alone. The district court denied the request. Sloan was present at trial.

[13] Before the district court, Castro argued that the quality of cross-examination of several witnesses amounts to constitutional error. He neither raises nor briefs this issue on appeal, choosing instead simply to attach a copy of his district court motion. Accordingly, Castro has failed to raise the issue on appeal. *See Lott v. Margett*, 80 F.3d 161, 166 (5th Cir. 1996); *R.A.M. Al-Ra'id v. Ingle*, 69 F.3d 28, 31 (5th Cir. 1995); *Brinkman v. Dallas County Deputy Sheriff Abner*, 813 F.2d 744, 748 (5th Cir. 1987). We see no merit in it in any event.

ineffective assistance of counsel claim. To the extent Castro argues that, somehow, the tardiness of the *pro hac vice* motion contributed to his conviction, we simply observe that, at the very least, such a claim fails to meet the second prong of the *Strickland* standard. "If proof of one element is lacking, the court need not examine the other." *Kirkpatrick v. Blackburn*, 777 F.2d 272, 285 (5th Cir. 1985), *cert. denied*, 106 S.Ct. 2907 (1986). In order to prove the prejudice prong of the *Strickland* test, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *United States v. Rosalez-Orozco*, 8 F.3d 198, 199 (5th Cir. 1993) (internal quotation marks omitted). Because there is nothing to suggest that the tardiness of the *pro hac vice* motion had any impact on the trial and because in all events "the evidence of Castro's guilt was overwhelming," *United States v. Castro*, 874 F.2d 230, 233 (5th Cir. 1989), we find no merit in this claim.

### III.

Castro's final claim challenges his conviction under count five of the indictment, using or carrying a firearm during and in relation to a drug trafficking crime. *See* 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 924(c)(1). Castro's challenge has two parts. First, he proffers a planted-evidence theory that he contends is supported by the testimony presented at his trial. Second, for the

15

first time on appeal, Castro argues that his conviction under 18 U.S.C. § 924(c)(1) is invalid after the Supreme Court's decision in *Bailey*, 116 S.Ct. 501. Neither claim is valid.

Castro's first contention borders on the absurd. Far from this planting theory being an "Indisputable Fact," the testimony at trial was consistent and uncontroverted. Castro claims Agent Coleman, on the morning after the arrests, conducted a "professional search" of Ramos's vehicle that yielded the gun under the front seat.[14] According to Castro, the fact that Agent Stripling found a duffel bag containing another gun and a one-kilogram package of cocaine in Ramos's vehicle the next morning presents compelling evidence of government-planted evidence. As the district court observed, Castro "blatantly misstates testimony." *United States v. Castro*, No. 88-371, at 3.

Agent Coleman, on cross examination, testified that: "I didn't search the trunk. I didn't know what was in the trunk. I only opened the trunk momentarily to put the weapon in it, to secure it for security purposes, and I immediately closed it." Agent Stripling testified that, after she and Agent Stein learned that the DEA agents had retrieved only 409 one-kilogram packages from the trailer, they performed a complete inventory search of Ramos's vehicle. Agent Stripling testified only that she discovered a kilogram package of cocaine in the duffel bag. Agent

---

[14] Castro left the offload site in Ramos's vehicle.

16

Stein testified that Agent Stripling discovered the package of cocaine and that he discovered Castro's weapon and a box of bullets; all three items were in the duffel bag. Agent Stein further testified that the weapon recovered was the weapon that had been in Castro's possession throughout the trip. There is no factual basis for Castro's contention that the weapon was planted in the trunk of Ramos's vehicle.

Castro next contends that his conviction under 18 U.S.C. § 924(c)(1) was improper because he never "brandished, carried[,] fired, pointed[,] or used" the weapon. As Castro did not raise this fact-based claim in his section 2255 motion before the district court, we will not address its merits. It has long been the law that we will not address on appeal issues that were not presented to the district court in an appellant's section 2255 motion. *United States v. Carvajal*, 989 F.2d 170, 170 (5th Cir. 1993); *United States v. Cates*, 952 F.2d 149, 152 (5th Cir.), *cert. denied*, 112 S.Ct. 2319 (1992); *Earvin v. Lynaugh*, 860 F.2d 623, 627-28 (5th Cir. 1988), *cert. denied*, 109 S.Ct. 1558 (1989); *United States v. Houston*, 745 F.2d 333, 334 (5th Cir. 1984), *cert. denied*, 105 S.Ct. 1369 (1985); *Hall v. Maggio*, 697 F.2d 641, 643 (5th Cir. 1983); *United States v. McKnight*, 693 F.2d 476 (5th Cir. 1982). Even assuming there were clear error, we would not exercise our discretion to reverse; there has been no miscarriage of justice or

17

the like.[15]

IV.

For the foregoing reasons, the district court's denial of Castro's section 2255 motion to vacate is

AFFIRMED.

---

[15] Assuming without deciding that the statutory interpretation announced in *Bailey* applies to pre-*Bailey* convictions on collateral review, *see United States v. Andrade*, 83 F.3d 729, 730 n.1 (5th Cir. 1996) (noting that "whether the standards governing the retroactivity of new rules of criminal procedure on collateral review, as articulated in *Teague v. Lane*, 109 S.Ct. 1060 (1989), likewise apply to decisions interpreting substantive criminal statutes is an issue that has not been decided in this circuit"), we observe that 18 U.S.C. § 924(c)(1) has two prongs——"use" and "carry." 18 U.S.C. § 924(c)(1) ("uses or carries"); *see Bailey*, 116 S.Ct. at 509 ("The 'carry' prong of § 924(c)(1), for example, brings some offenders who would not satisfy the 'use' prong within the reach of the statute."). In *Turner v. United States*, 90 S.Ct. 642, 654 (1970), the Supreme Court recognized the general rule that, "when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged." Castro's indictment charged that he "did knowingly and intentionally use and carry a firearm." Indictment, Count 5. At Castro's trial there was testimony that he kept his weapon on his person for a significant portion of the voyage to, and from, the "mother ship." *E.g.*, "Mr. Castro demanded to have his weapon back; it was like a security blanket."; *see also United States v. Garcia*, 86 F.3d 394, 402-03 (5th Cir. 1996) (observing the different standard for "carrying" and reversing conviction because, although evidence showed the defendant *carried* a weapon, the indictment alleged only "use"). The jury charge authorized conviction on the basis of "carried" as well as "used" ("used or carried"). Castro makes no complaint of the charge.

18