**UNITED STATES of America, Plaintiff–Appellee Cross–Appellant,**

v.

**Charles D. PACE, Defendant–Appellant Cross–Appellee.**

**No. 90–8543.**

United States Court of Appeals, Fifth Circuit.

Feb. 24, 1992.

Stephen M. Orr, Orr, Davis & Beaver, Austin, Tex., for defendant-appellant cross-appellee.

Diane D. Kirstein, Asst. U.S. Atty., Ronald F. Ederer, U.S. Atty., San Antonio, Tex., for plaintiff-appellee cross-appellant.

Before POLITZ, Chief Judge, KING and JOHNSON, Circuit Judges.

KING, Circuit Judge:

Our original opinion in this appeal, reported at 950 F.2d 961, is withdrawn in its entirety, and the following is substituted therefor:

In the central issue in this appeal, Charles D. Pace invites us to hold that which the Supreme Court has rejected in a factually indistinguishable case—that a barn physically separate from a home enjoys Fourth Amendment protection because it is within the curtilage of the home, and that the area surrounding a barn is protected as a "business curtilage." Because we do not believe that the Supreme Court would treat this case any differently than it did *United States v. Dunn*, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987), we decline Pace's invitation. We find that the search of a barn which ultimately led to Pace's conviction for conspiracy to possess, and possession of marijuana with intent to distribute, was constitutional, and therefore affirm his conviction. We also find that, although the district court improperly calculated Pace's sentence, Pace received the statutory minimum sentence required for a violation of 21 U.S.C. § 841(a). Because the district judge evinced an intention to give Pace the statutory minimum, we need not remand for resentencing. We therefore affirm Pace's sentence.

## I.

In October 1988, law enforcement officials in Travis County, Texas received information that marijuana was being grown in large quantities in a barn located on a 43–acre tract at the end of Lambert Road in Travis County. The barn was owned by Robert and Ouida Pace, the parents of appellant Charles Pace. In May 1989, a different informant contacted officials and told them that a large-scale marijuana operation was being conducted in the barn. Periodic surveillance was established on the barn and the property, and police observed appellant Pace, as well as John K. Treanor and John D. O'Brien, on the property.

On June 12, 1989, two officers entered the property and, looking through a hole in the barn, observed marijuana plants growing inside. On the basis of this information, a search warrant was issued for the barn. On June 15, agents of a joint task force composed of DEA agents and the Organized Crime Unit of the Austin Police Department executed the warrant. The officers seized 796 growing marijuana plants and a prescription bottle in Pace's name with marijuana seeds inside, and arrested Pace, O'Brien and Treanor. Searches of the defendants' persons yielded keys to the padlock securing the entrance gate to the property and a key to a safe deposit box at a bank in Austin. On the basis of the information obtained from the search of the barn and the arrests, warrants were issued for the residence of Pace, the residence O'Brien shared with Treanor and the safe deposit box. At the O'Brien and Treanor residence officers seized documents, photographs, ledgers, catalogs, accounts, receipts, magazines, a small amount of marijuana and $5,665 in cash; at the Pace residence they seized a triple beam balance scale, a small quantity of marijuana and various business and phone records; and from the safe deposit box they seized a key to the gate of the property where the barn was located.

All three defendants were indicted for conspiracy to possess with intent to distribute more than 100 marijuana plants in violation of 21 U.S.C. §§ 841(a)(1) and 846, and knowingly possessing more than 100 marijuana plants with intent to distribute in violation of 21 U.S.C. § 841(a)(1).[1] Each

---

1. Although all three defendants were charged jointly, we treat their appeals in separate opinions. *See United States v. Treanor*, 950 F.2d 972

filed a motion to suppress the evidence seized from the barn on June 15, arguing that the officers' observations of June 12, which formed the basis for the affidavit in support of the search warrant, resulted from an unconstitutional search of the barn. They further argued that the warrants for the searches of their homes and the safe deposit box were tainted by the unconstitutional search of the barn and that the evidence seized at those locations constituted "fruit of the poisonous tree."

After holding a hearing on the suppression motion, the district court made detailed findings of fact concerning the barn, the surrounding property, and the June 12 search. At the time of the search, the property was being used in part for the purpose of farming and ranching. The entrance to the property is secured by a closed gate with a lock and chain and a "Beware of Dog" sign. The property is surrounded by a fence, and there are numerous interior fences. The fences are constructed of "hog wire" topped with several strands of barbed wire. The fences are approximately four feet high and are designed to block the passage of objects larger than four to six inches in diameter.

The property is improved with a small wood frame house and storage shed located within 100 feet of the front gate. Behind a garage, approximately 50–60 feet from the house, is the barn and stock pen. The barn is separated from the rest of the house by an interior fence. The barn, a commercial structure used for the business of farming and ranching, is constructed primarily of corrugated steel panels and is completely enclosed. It has no windows, and the only access is through two locked doors. Police helicopter surveillance of the property revealed that the barn was covered with translucent corrugated sheeting of the type used in greenhouses, but was not so transparent that the police could see through it. The interior of the barn was not visible from outside the property.

On June 12, two officers entered the property, one by squeezing through a gap between the main gate and a fence post and the other by climbing over the gate. After knocking on the door of the house and looking through a window, the officers determined that the house was vacant. They crossed at least two more gates and went to the back side of the barn, where they found a small opening. The officers could not see inside the barn from any distance, but had to press their faces close to the opening to see inside. Their observation of marijuana plants in the barn led them to apply for a search warrant, which they executed on June 15.

On the basis of these facts, the district court denied the suppression motion. The court first found that, because the barn was in an open field outside the curtilage of the home, the defendants had no reasonable expectation of privacy which would require the application of Fourth Amendment principles. The court determined that the barn was outside the curtilage by applying the four-part analysis of *United States v. Dunn*, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987), a factually similar case in which DEA agents stood outside a barn and observed drug operations within.[2] The court also rejected the argument that, even if the barn was not within the curtilage of the home, the area surrounding it was protected as the curtilage of a commercial structure. The court noted that the Supreme Court's assertion in *Dunn* that the officers were standing in an

(5th Cir.1991); *United States v. O'Brien*, 950 F.2d 969 (5th Cir.1991).

2. *Dunn* requires, for the purpose of determining whether a particular search took place within the curtilage, an analysis of (1) the proximity of the area claimed to be curtilage to the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the resident to protect the area from observation by people passing by. *Id.* at

294, 107 S.Ct. at 1134. The district court found that the barn was 52 feet from the home, eight feet less than the barn in *Dunn;* that the barn was separated from the house by a fence, as in *Dunn;* and that the officers had evidence that the barn was not being used in connection with "the intimacies of the home." It is not entirely clear from the court's opinion whether it thought the fourth factor supported the constitutionality of the search.

open field when they observed the drug operation inside the barn amounted to rejection of the notion of a business curtilage surrounding a barn. The court denied the motion to suppress evidence seized from the Lambert Road barn, and, because the evidence seized from the barn furnished probable cause to search the residences and the safe deposit box, denied the motion to suppress the fruits of those three searches.

Pace proceeded to trial and was convicted by a jury on both counts. The district judge sentenced Pace to concurrent terms of imprisonment of 51 months for the drug convictions. He added to this a consecutive prison term of nine months, pursuant to 18 U.S.C. § 3147, because following his arrest and pretrial release Pace was convicted of misdemeanor assault in state court. Pace also received a five year period of supervised release, a fine of $10,000, and a $100 special assessment. Pace appeals the denial of his suppression motion, and the government appeals the sentence.

## II.

### A. *The Search of the Barn*

■ Pace first argues that the warrantless search of the barn was unconstitutional because it took place within the curtilage of the home. We find this argument foreclosed by the Supreme Court's decision in *United States v. Dunn*, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987), a case whose facts so closely resemble the facts in this case that we recount them in some detail. In *Dunn*, DEA agents established surveillance,[3] including the taking of aerial photographs, of a large tract of rural property on which illegal drug operations were suspected. The property was completely encircled by a perimeter fence, and there were several interior fences constructed mainly of posts and multiple strands of

barbed wire. A residence and a small greenhouse were encircled by one interior fence, and there were two barns located approximately 50 yards from this fence. The front of the larger of the two barns was encircled by a wooden fence, and locked waist-high gates barred entry into the barn. Netting material stretched from the ceiling to the top of the wooden gates of this barn. 480 U.S. at 297, 107 S.Ct. at 1137.

Two law enforcement officials made a warrantless entry by crossing the perimeter fence and one interior fence. Standing midway between the residence and the barn, one official smelled what he thought was a chemical involved in the manufacture of phenylacetone coming from the direction of the barns. The officers crossed a barbed wire fence and looked into the smaller of the barns, where they found only empty boxes. They then crossed another barbed wire fence and the wooden fence encircling the front of the larger barn, walked to the locked gates, and viewed the interior of the barn by shining a flashlight through the netting. The officers did not enter the barn, but obtained a warrant authorizing a search of the ranch. 480 U.S. at 297–98, 107 S.Ct. at 1137–38.

The primary question before the Court was whether the barn was within the protected curtilage of the house. The Court began by referring to its recent decision in *Oliver v. United States*, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984), in which it had reaffirmed a distinction for Fourth Amendment purposes between "open fields" and the curtilage of the home. Open fields are protected neither under the text of the Fourth Amendment[4] nor under the conception of the Amendment in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), as protecting

---

**3.** The agents originally pinpointed the property in *Dunn* by means of electronic "beepers" which transmitted signals from items the defendants had purchased. 480 U.S. at 296–97, 107 S.Ct. at 1137.

**4.** The Fourth Amendment "indicates with some precision the places and things encompassed by its protections ... '[T]he special protection ac-

corded by the Fourth Amendment to the people in their "persons, houses, papers, and effects," is not extended to the open fields. The distinction between the latter and the house is as old as the common law.' " *Oliver*, 466 U.S. at 176, 104 S.Ct. at 1740 (quoting *Hester v. United States*, 265 U.S. 57, 59, 44 S.Ct. 445, 446, 68 L.Ed. 898 (1924)).

those areas in which individuals have a "reasonable expectation of privacy." *Oliver*, 466 U.S. at 176–79, 104 S.Ct. at 1740–42. The curtilage of the home, on the other hand, was distinguished from open fields in the common law, a distinction the Court in *Oliver* took to mean that "only the curtilage, not the neighboring open fields, warrants the Fourth Amendment protections that attach to the home." *Id.* at 180, 104 S.Ct. at 1742.

The extent of the curtilage to which Fourth Amendment protection attaches is not unlimited. In *Dunn*, the Court undertook to define with more precision than it had previously the boundaries of this space. The inquiry is guided by "factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself," 480 U.S. at 300, 107 S.Ct. at 1139, with the central consideration the question whether "the area harbors the 'intimate activity associated with the "sanctity of a man's home and privacies of life." ' " *id.* (quoting *Oliver*, 466 U.S. at 180, 104 S.Ct. at 1742 (quoting *Boyd v. United States*, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886))). The Court identified four factors in particular that guide the curtilage inquiry,[5] taking care to point out that these are not to be applied mechanically but are useful to the extent they bear on the ultimate question whether the area "is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.* 480 U.S. at 301, 107 S.Ct. at 1140.

Applying the factors to the facts in *Dunn* itself, the Court found that the barn lay outside the protected curtilage in open fields. First, the barn was 50 yards from the fence surrounding the house and 60 yards from the house. This substantial distance alone "support[ed] no inference that the barn should be treated as an ad-

junct of the house." *Id.* at 302, 107 S.Ct. at 1140. Second, the barn did not lie within the fence that surrounded the house. The fence surrounding the house was considered significant as such fences generally "serve[ ] to demark a specific area of land immediately adjacent to the house that is readily identifiable as part and parcel of the house." *Id.* Third, law enforcement officials had objective data that the barn was being used for activities other than those associated with the intimacies of the home. *Id.* Fourth, the defendants did little to prevent someone standing in the open fields from viewing the interior of the barn; the fence surrounding the barn did not appear to serve this purpose. *Id.* at 302–03, 107 S.Ct. at 1140.

As the district court held, analysis of these factors in the instant case yields the same result as in *Dunn*. Apart from the need for the officers in this case to press their faces up to the barn, the factual similarity to *Dunn* is striking. The barn was located a significant distance from the house; it was separated from the house by an interior fence; earlier surveillance, including aerial photographs indicated that it was not being used for activities associated with the intimacies of home life;[6] and it was readily visible from the surrounding area. Pace attempts to distinguish *Dunn* by pointing out that the officers in this case could not see into the barn except by putting their faces up to the siding. He argues that this is somehow different than standing outside a barn and shining a flashlight on a netting. However, the holding of *Dunn* was that once the officers were standing in open fields outside the protected curtilage of the home, they were privileged to view the inside of the barn. The officers in this case were likewise privileged[7] to stand in the open field, and the distance between their bodies and the structure into which they peered is of no consequence. To hold otherwise would re-

---

5. *See supra* note 2.

6. Aerial photography from an aircraft legitimately in the airspace over private property was held not to violate the Fourth Amendment in *California v. Ciraolo*, 476 U.S. 207, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986).

7. At least for Fourth Amendment purposes; although they may have been trespassing under state law, this fact is of no consequence to Fourth Amendment analysis. *Oliver*, 466 U.S. at 183–84, 104 S.Ct. at 1744.

quire us to draw a specious distinction between those open field searches in which officers physically come up against a structure and those in which they are able to see inside even while standing back from the structure. The officers in this case did not physically tamper with or enter the barn in order to view its contents, but merely stood outside in the open field and looked in.[8] Thus, the search did not violate the Fourth Amendment's proscription of searches within the curtilage of the home.

■ Relying on *Dow Chemical v. United States*, 476 U.S. 227, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986), Pace presents as an alternative ground for reversal the notion that the area surrounding the barn enjoyed Fourth Amendment protection as a "business curtilage." He argues that the Fourth Amendment accords the barn independent protection as a commercial establishment, and that the surrounding area is protected under a theory analogous to the home curtilage theory. This argument too is foreclosed by the decision in *Dunn*.

In *Dow Chemical*, the Court reaffirmed that there is an expectation of privacy in commercial structures which society is prepared to accept as reasonable, thus bringing the interiors of such structures within the protections of the Fourth Amendment. 476 U.S. at 236, 106 S.Ct. at 1825; *see also See v. City of Seattle*, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967). The Court in *Dunn* did not dispute this precept when the defendant argued that he had a legitimate expectation of privacy in the barn which was violated when the officers peered inside. But the Court implicitly rejected the notion that the open fields surrounding a barn constitute a protected curtilage area into which law enforcement officials may not make a warrantless entry. The Court expressly referred to the fact that, when the officers viewed the inside of the barn, they were standing in open fields. Like the officers here, they stopped at the edge of the structure and merely looked inside without physically entering. We

read this to mean that, given the physical layout of the property in *Dunn* and here, the open field surrounding a barn extends up to the edge of the structure itself, thus enabling officers to come as close to the structure as necessary to look inside without physically entering. Whatever *Dow Chemical* may have left open concerning the concept of a curtilage surrounding a business or commercial establishment, *Dunn* indicates that there is no business curtilage surrounding a barn lying within an open field. Thus, there was no constitutional violation when the officers crossed the fence and looked into the Pace barn. It follows that the warrant the officers obtained for the search of the barn was proper, as their observations furnished them with ample probable cause to search for the instrumentalities of a drug operation.

## B. *The Search of the Residence*

■ The information the police obtained from the search of the barn and the arrests of Pace, O'Brien and Treanor led them to file affidavits in support of warrants to search the suspects' residences. Pace contends that even if the information provided in these affidavits was true, the warrant for the search of his home was still unsupported by probable cause. He characterizes the officers' contention in the affidavit that drug dealers normally keep records at their homes as too conclusory to constitute probable cause. Certainly, under *United States v. Freeman*, 685 F.2d 942 (5th Cir. 1982), the officers' possession of probable cause to believe that a crime had been committed at the time of the barn search and arrests did not automatically translate into probable cause to search the suspects' homes for additional evidence of the crime. *Freeman* requires that "facts must exist in the affidavit which establish a nexus between the house to be searched and the evidence sought." *Id.* at 949 (citations omitted). In *Freeman*, we found no probable cause to search the defendant Boese's residence for business records and other evidence of drug crimes where the police

---

**8.** The officers' method of observing the contents of the barn in this case arguably was less intrusive than in *Dunn*, as they merely looked into the barn with the naked eye. In *Dunn*, the officers used a flashlight as an aid.

had observed Boese engaged in drug smuggling operations at other locations. Although police could connect Boese to the residence, nothing in the affidavit indicated that suspicious activity had taken place at the residence and nothing the police observed or knew about Boese's activities away from the residence established the home as a location at which illegal operations could have taken place. *Id.* at 950–51.

While the evidence provided in the affidavit in *Freeman* connecting the defendant's activities to his home was too tenuous to support a finding of probable cause to search for records and drug paraphernalia, that case does not, as Pace seems to suggest, categorically *prohibit* police officers from searching a suspect's home when the suspect has been arrested at another location. We concluded that there *was* probable cause to search for passports, personal identification papers and bank and safety deposit box records because these were "precisely the sorts of items which people tend to keep at home among their personal papers and effects." *Id.* at 949. Similarly, in *United States v. Maestas,* 546 F.2d 1177 (5th Cir.1977), the fact that the defendant's accomplices sent material to the defendant at home as part of a counterfeiting scheme, combined with the reasonable inference that people keep mail at their home, supported probable cause to search the defendant's home for mail connected with the scheme. The affidavit must connect (in a manner more convincing than in *Freeman* ) the residence to be searched with the illegal activity, *Freeman,* 685 F.2d at 949, but this nexus may be established "through normal inferences as to where the articles sought would be located." *Id.; see also United States v. Minis,* 666 F.2d 134, 139 (5th Cir.), *cert. denied,* 456 U.S. 946, 102 S.Ct. 2013, 72 L.Ed.2d 469 (1982).

■ The circumstances surrounding the search of Pace's residence are identical in all important respects to the search we upheld in *United States v. Raborn,* 872 F.2d 589 (5th Cir.1989). There, police executed a warrant at a rural farmhouse, where they found equipment and chemicals associated with a drug manufacturing operation. They arrested the defendant Gentry at the time of the search, and thereafter obtained a warrant to search Gentry's home. Because the officers personally observed the drug operation but did not find on the premises the kind of business records one would expect to find in connection with a drug manufacturing operation, we held that the affidavit in support of the warrant passed muster under *Freeman.* 872 F.2d at 596. The expectation of finding evidence of the crime at the suspect's home, *given that such evidence was not found at the scene of the illegal activity,* was a reasonable inference which supported the magistrate's determination of probable cause to search the residence. *Id.* Likewise, in this case, the officers executed a warrant at the barn and observed a drug operation in progress, but did not find the records one would normally associate with the business aspect of such an operation. The DEA agent who applied for the warrant described what he saw at the barn and then indicated in his affidavit, *inter alia,* that individuals who cultivate marijuana routinely conceal contraband, proceeds of drug sales and records of drug transactions in their homes in order to prevent law enforcement officials from discovering them. Probable cause involves a practical, commonsense determination by a neutral judicial officer whether the information provided represents a basis for believing crime has been committed. *See Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983); *United States v. May,* 819 F.2d 531 (5th Cir.1987). The affidavit described a sufficient connection between the illegal activity at the barn and the expectation of what would be found at Pace's residence to give rise to probable cause to search Pace's home. While the notion that "few places are more convenient than one's residence for use in planning criminal activities and hiding fruits of a crime," *United States v. Green,* 634 F.2d 222, 226 (5th Cir.1981), does not provide carte blanche for searching a home when one is suspected of illegal activity, concealment of the business records of a drug operation at home certainly is a reasonable

inference when a search of the situs of the operation yields no records. Accordingly, the district court correctly denied the motion to suppress evidence seized at Pace's home.[9]

## III.

■ We turn next to the government's appeal of Pace's sentence. Pace was convicted of possession with intent to distribute more than 100 marijuana plants and conspiracy to possess with intent to distribute more than 100 marijuana plants, in violation of 21 U.S.C. §§ 841(a)(1) and 846. These crimes are punishable under 21 U.S.C. § 841(b), which provides that in the case of a violation of § 841(a) involving more than 100 marijuana plants, the sentence shall be "a term of imprisonment which may not be less than 5 years and not more than 40 years."

In the presentence report, the probation officer noted the statutory minimum but computed Pace's Sentencing Guideline range at 51 to 63 months imprisonment.[10] The district court sentenced Pace to 51 months imprisonment on each count to run concurrently, nine months less than the statutory minimum, and then added nine months pursuant to 18 U.S.C. § 3147 because Pace was found guilty of assault in state court following pretrial release. In response to the government's request for an explanation at the sentencing hearing of why he was going below the statutory minimum, the judge explained that "I was intentionally going below that in this case only because of Title 18, United States Code, Section 3147, through which I brought the sentence up to a total equal to the statutory minimum."

This method of computing the sentence was incorrect. First, the district judge should have started with the statutory minimum sentence of 60 months. We have

repeatedly held that the Guidelines do not supplant the minimum sentences provided for in various criminal statutes. *United States v. Garcia–Pillado*, 898 F.2d 36, 39 (5th Cir.1990); *United States v. Stewart*, 879 F.2d 1268, 1272 (5th Cir.), *cert. denied*, 493 U.S. 899, 110 S.Ct. 256, 107 L.Ed.2d 205 (1989); *United States v. Roberson*, 872 F.2d 597, 606 & n. 7 (5th Cir.), *cert. denied*, 493 U.S. 861, 110 S.Ct. 175, 107 L.Ed.2d 131 (1989).[11] As we stated in *Stewart*, "[t]here is nothing in the language of the guidelines to imply a repeal of other sentencing statutes." 879 F.2d at 1272. Indeed, § 5G1.1(b) requires a district court to apply the statutory minimum in lieu of the sentence calculated under the Guidelines. Thus, the court was obligated to sentence Pace at least to 60 months imprisonment.

■ Second, the judge should not have enhanced Pace's sentence under 18 U.S.C. § 3147. That section, as amended, provides:

A person convicted of an offense committed while released under this chapter shall be sentenced, in addition to the sentence prescribed for the offense to—

(1) a term of imprisonment of not more than ten years if the offense is a felony; or

(2) a term of imprisonment of not more than one year if the offense is a misdemeanor.

A term of imprisonment imposed under this section shall be consecutive to any other sentence of imprisonment.

This statute provides for an enhanced sentence for a person who commits a *federal* crime while on release, and the enhancement applies to the sentence for the new crime committed while on release, not the original crime for which the defendant is

---

**9.** Our holding disposes of Pace's contention that the statements he made after the search of the barn and his arrest were inadmissible at trial.

**10.** Based on the amount of marijuana involved, the probation officer set the base offense level at 22 and added two points for obstruction of justice, bringing the total offense level to 24. Pace had a criminal history score of zero, result-

ing in a sentencing range of 51 to 63 months imprisonment. *See* U.S.S.G. Sentencing Table.

**11.** All circuits which have reached the issue are in accord with this basic principle. *See United States v. Rodriguez*, 938 F.2d 319, 320 (1st Cir. 1991) (collecting cases).

on release.[12]

Despite these two errors, we see no reason to disturb Pace's sentence. The end result was a sentence of 60 months, the mandatory minimum for Pace's offense. The judge's statements about why he was going below the minimum and then adding nine months for the enhancement indicate that he wanted to give Pace the statutory minimum. Were we to remand, Pace would be subject only to the possibility of receiving three more months (63 months was the upper range of his Guideline sentence). In light of the judge's apparent intent to give Pace only the 60–month minimum, we consider the errors harmless and see no reason to disturb the sentence.[13]

## IV.

For the foregoing reasons, we AFFIRM Pace's conviction and sentence.

12. We overlooked this in our original opinion, holding that the nine months the judge gave Pace for the state court misdemeanor had to be added to the statutory minimum for the federal drug offense. On our own motion, we asked the parties to file letter briefs addressing the applicability of 18 U.S.C. § 3147 to state offenses committed while on release for a federal offense. Both parties agree that § 3147 has no applicability in these circumstances.

13. In its letter brief, the government suggests that we vacate and remand because the probation officer improperly placed Pace in criminal history category I. The government contends that, under U.S.S.G. § 4A1.1(b), the officer should have added two points to Pace's criminal history score for the state assault conviction, thus placing him in criminal history category II. With an adjusted offense level of 24 and a criminal history category of II, Pace's Guideline range would be 57 to 71 months imprisonment. The government implies that we should remand to enable the district judge to impose a sentence of at least 60 months but potentially reaching 71 months. As the government never contested the calculation of Pace's criminal history category in its brief on appeal, we do not consider it here.