**UNITED STATES of America, Plaintiff–Appellee,**

v.

**James Glenn THOMAS, Defendant–Appellant.**

**No. 91–4542.**

United States Court of Appeals, Fifth Circuit.

Sept. 16, 1992.

Rehearing Denied Oct. 16, 1992.

---

Melvyn Carson Bruder, Dallas, Tex. (court-appointed), for defendant-appellant.

Randall Fluke, Asst. U.S. Atty., Bob Wortham, U.S. Atty., Sherman, Tex., for plaintiff-appellee.

Before VAN GRAAFEILAND,* KING, and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Defendant, James Glenn Thomas, was convicted of fourteen counts of illegal activities involving the alteration of motor vehicle identification numbers, in violation of 18 U.S.C. §§ 511–12, 2321–22. The district court sentenced Thomas to 51 months on each count, such sentences to run concurrently. Thomas appeals his conviction and sentence on the grounds that the district court improperly admitted illegally seized evidence and erred in sentencing him. We affirm.

I

As part of the Texas Department of Public Safety's ("DPS") pilot program of documenting salvage vehicles not economically feasible to rebuild,[1] investigator Cliff Babbitt, a DPS agent, tracked a salvage vehicle to Thomas's auto salvage business. Babbitt conducted an inventory inspection, pursuant to Tex.Rev.Civ.Stat.Ann. art. 6687–2(e) (West Supp.1992).[2] During this inspection, Babbitt seized a vehicle and VIN plates, which provided him with the necessary information to secure a search warrant for Thomas's residence. Acting pursuant to the search warrant, Babbitt seized VIN plates found in Thomas's briefcase at his home.

Thomas was convicted of fourteen counts of trafficking in motor vehicles with falsified identification numbers, see 18 U.S.C. §§ 2321–22, and of altering and falsifying vehicle identification numbers. See 18 U.S.C. §§ 511–12. The district court sentenced Thomas to 51 months on each count,

such sentences to run concurrently. Thomas challenges his conviction and sentence, contending that: (a) the warrantless search of his business did not fall under an exception to the warrant requirement; (b) the search warrant for his residence was not supported by probable cause; and (c) the trial judge erred in calculating his sentence.

II

A

■ Administrative searches of salvage yards are generally held to be exceptions to the warrant requirement of the Fourth Amendment because of "the important state interest in administrative schemes designed to regulate the vehicle-dismantling or automobile-junkyard industry." *New York v. Burger,* 482 U.S. 691, 698, 107 S.Ct. 2636, 2641–42, 96 L.Ed.2d 601 (1987). One of the requirements of a valid administrative scheme is the " 'certainty and regularity of its application.' " 482 U.S. at 703, 107 S.Ct. at 2644 (quoting *Donovan v. Dewey,* 452 U.S. 594, 603, 101 S.Ct. 2534, 2540, 69 L.Ed.2d 262 (1981)). Thomas does not question the validity of the Texas scheme authorizing the search of his business. *See* Tex.Rev.Civ.Stat.Ann. art. 6687–2(e). Instead, he argues that the particular administrative search of his salvage business violated the Fourth Amendment because it was not part of a scheme of periodic and frequent inspections, but rather was targeted at gathering information concerning specific vehicles. This argument is meritless.

■ Administrative searches conducted pursuant to valid statutory schemes do not

* Senior Circuit Judge of the Second Circuit, sitting by designation.

1. The purpose of the program is to uncover illegal "salvage switch" or "vehicle identification number ("VIN") switch" operations. Each VIN is a unique number that identifies only one vehicle. Under a salvage or VIN switch scheme, the VIN from the salvage is switched to a stolen car, which is then sold under the guise of rebuilt salvage. See Record on Appeal, vol. 3, at 242, 252–53.

2. Article 6687–2(e) provides:

An automobile salvage dealer shall keep all records required to be kept by this article for one year after the date of sale or disposal of the item, and he shall allow an inspection of the records by a peace officer at any reasonable time. A peace officer may inspect the inventory on the premises of the automobile salvage dealer at any reasonable time in order to verify, check, or audit the records. An automobile salvage dealer or an employee of the dealer shall allow and shall not interfere with a full and complete inspection by a peace officer of the inventory, premises, and inventory records of the dealer.

violate the Constitution simply because of the existence of a specific suspicion of wrongdoing. In *United States v. Villamonte–Marquez*, 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983), the defendants argued that customs officials could not rely on a statute authorizing administrative searches of vessels, because the officials were following an informant's tip that a vessel was carrying marijuana. The Court rejected this argument because it saw "little logic in sanctioning such examinations of ordinary, unsuspect vessels but forbidding them in the case of suspected smugglers." *Villamonte–Marquez*, 462 U.S. at 584 n.3, 103 S.Ct. at 2577 n. 3 (quoting *United States v. Arra*, 630 F.2d 836, 846 (1st Cir.1980)); *see United States v. Nechy*, 827 F.2d 1161, 1167 (7th Cir.1987) ("[I]t does rather turn the Fourth Amendment on its head to complain about not the dearth but the plethora of grounds" of suspicion.).

▬ Thomas also claims that Babbitt could not legally seize the vehicle and VIN plates from his business because Babbitt did not know at the time of the search that the vehicle was stolen. Seizure is appropriate where the government agent is lawfully on a defendant's property, and has probable cause to associate goods with criminal activity. *See Texas v. Brown*, 460 U.S. 730, 739, 103 S.Ct. 1535, 1542, 75 L.Ed.2d 502 (1983) ("[O]ur decisions have come to reflect the rule that if, while lawfully engaged in an activity in a particular place,

police officers perceive a suspicious object, they may seize it immediately."). Babbitt observed the tell-tale signs of a salvage switch in progress when he conducted his inventory inspection.[3] This provided Babbitt with probable cause to associate the seized goods with criminal activity. Because Babbitt was lawfully on defendant's property for an administrative inspection, the seizure of the vehicle and VIN plates was valid.

## B

▬ Thomas further contends that the affidavit[4] in support of the search warrant for his home lacked probable cause because: (a) the affidavit did not expressly include a statement of timeliness; and (b) the affidavit did not establish a nexus between defendant's home and the instrumentalities of the offense. In considering these issues, "this court is not limited to the 'clearly erroneous' standard and may make an independent review of the sufficiency of an affidavit." *Hale v. Fish*, 899 F.2d 390, 398–99 (5th Cir.1990). The "totality of the circumstances" test governs whether a search warrant is supported by probable cause. *See Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Under *Gates*, "the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed." 462 U.S. at 238–39, 103 S.Ct. at 2332 (quot-

---

**3.** For example, Babbitt observed on several vehicles: (1) vice marks indicating forced entry; (2) VIN plates that had been burned and repainted; and (3) engine and transmission numbers that had been ground and restamped. *See* Record on Appeal, vol. 3, at 289–345.

**4.** The affidavit reads, in relevant part:

Affiant is currently involved in an investigation of an organized and sophisticated theft ring. This theft ring involves the theft of and the alteration of motor vehicles. In this investigation Affiant has good reason to believe and does believe that James Glenn Thomas hereinafter styled defendant, is altering stolen motor vehicles to conceal the identity. These alterations include the grinding and re-stamping of certain confidential vehicle identification numbers. The dies used in re-stamping of certain confidential vehicle identification numbers are used in furtherance of the of-

fense of theft and therefore, these dies are criminal instruments .... Affiant has good reason to believe and does believe that these criminal instruments are being concealed by the defendant at his shop or residence .... Affiant's belief is based on the fact that numerous vehicles have been seized that were sold by the defendant. These vehicles were altered and most have been identified as stolen. These alterations were extensive and required numerous tools and specialized equipment leading Affiant to believe the work to be done in the defendant's shop.... Therefore, the dies and other criminal instruments, used in furtherance of the offense of theft; are believed to be concealed at the residence as well as the shop. Affiant request [sic] the issuance of this search warrant in accordance of [sic] CCP Article 18.02.

Government Exhibit Z, *included in* Brief for Thomas, Appendix A.

ing *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)).

█ While Babbitt's affidavit failed to mention any dates connecting the suspected crime to the defendant, we do not find this oversight to be fatal. Babbitt's affidavit included the following averments: (a) that he was "currently involved in an investigation" of an organized theft ring involving the alteration of VINs; (b) that he believed that Thomas was "altering stolen motor vehicles" to conceal their identities; (c) that he believed that "criminal instruments [used in furthering these crimes] are being concealed by the defendant at his shop or residence"; (d) that these criminal instruments "are believed to be concealed at the residence as well as the shop;" and (e) that his belief "is based on the fact that numerous vehicles have been seized that were sold by defendant." Brief for Thomas, Appendix A. All of these statements are in the present tense, and describe ongoing criminal activity.

Thomas does not allege that the facts recited in the affidavit were stale, nor is there any indication that the information in the affidavit was untimely. Moreover, the affidavit does not suggest that Babbitt purposely avoided using dates in order to use stale information to his advantage. *See* Brief for Thomas, Appendix A. Indeed, the most that can be said is that Babbitt simply forgot to put specific dates in his affidavit. Based on these circumstances, we cannot say that the issuing magistrate did not have a substantial basis for finding that probable cause existed. *See United States v. Smith,* 783 F.2d 648, 652 (6th Cir.1986) (holding that an affidavit established probable cause where the affiant stated that he had reason to believe marijuana "is now" on defendant's premises, and there was no indication that the affidavit contained stale information). Thus, we find that Babbitt's affidavit, though far from perfect, met its probable cause requirement.[5]

█ Thomas also contends that the affidavit failed to establish a nexus between the criminal activity and his home. This nexus "may be established 'through normal inferences as to where the articles sought would be located.' " *United States v. Pace,* 955 F.2d 270, 277 (5th Cir.1992) (quoting *United States v. Freeman,* 685 F.2d 942, 949 (5th Cir.1982)). During the inspection of Thomas's salvage business, Babbitt found and seized VIN plates and one vehicle, but did not find the dies used to restamp VINs. Since these criminal instruments were not found at Thomas's business, the expectation of finding the dies at Thomas's home was a reasonable inference supporting a determination of probable cause. *See Pace,* 955 F.2d at 277 ("The expectation of finding evidence of the crime at the suspect's home, given that such evidence was not found at the scene of the illegal activity, was a reasonable inference which supported the magistrate's determination of probable cause to search the residence."). Therefore, we find that Babbitt's affidavit did establish a nexus between the criminal activity and Thomas's home.

█ Thomas further asserts that the seizure of VIN plates from a briefcase in his home exceeded the scope of the warrant. He specifically contends that since the affidavit did not explicitly describe these plates as items to be seized, they should have been considered inadmissible at trial. While the affidavit does not explicitly mention VIN plates, the warrant authorizes the seizure of "dies and *other criminal instruments,* used in furtherance of the offense." Brief for Thomas, Appendix A (emphasis added). The VIN plates found in defendant's home were clearly instruments used in furthering defendant's scheme of altering VINs. Further, the

---

5. We recognize those cases holding that an affidavit's use of the present tense should not be approved as a sufficient means of conveying timeliness. *See, e.g., Dixon v. State of Florida,* 403 F.2d 49, 51 (5th Cir.1968); *Rosencranz v. United States,* 356 F.2d 310, 315–18 (1st Cir. 1966). However, we have not found any cases after *Gates,* holding that an affidavit automatically fails to meet its probable cause requirement because of the absence of dates. Thus, under the "totality of the circumstances" we conclude that Babbitt's affidavit established probable cause to issue the warrant.

dies which the DPS were searching for were no longer than two-and-a-half inches long and approximately a quarter-inch square. *See* Record on Appeal, vol. 3, at 330–31 (direct examination of Cliff Babbitt). Because it was reasonable to believe that Thomas's briefcase could contain the dies, the search of the briefcase did not exceed the scope of the warrant. *See United States v. Giwa,* 831 F.2d 538, 543–44 (5th Cir.1987) (" '[A]ny container situated within residential premises which is the subject of a validly-issued warrant may be searched if it is reasonable to believe that the container could conceal items of the kind portrayed in the warrant.' " (quoting *United States v. Gray,* 814 F.2d 49, 51 (1st Cir.1987))).

### C

■ The remaining issues before this Court involve Thomas's sentence. Thomas argues that the district court erred in calculating his criminal history score. In particular, he asserts that his previous sentence for theft in state court should not have been considered a "prior sentence" for purposes of applying U.S.S.G. §§ 4A1.1 and 4A1.2.[6] We review a district court's application of the sentencing guidelines to the facts for clear error. *See United States v. Shano,* 955 F.2d 291, 294 (5th Cir.), *cert. dismissed,* — U.S. ——, 112 S.Ct. 1520, 118 L.Ed.2d 201 (1992).

Under U.S.S.G. § 4A1.1(a), a court may "add three points for each prior sentence of imprisonment exceeding one year." The guidelines define "prior sentence" as "any sentence previously imposed ... for conduct not part of the instant offense." U.S.S.G. § 4A1.2(a)(1). Thomas argues that his state sentence for theft was not a "prior sentence" because it involved conduct which was part of his instant federal offense for altering VINs.

■ The interpretation of "conduct not part of the instant offense" is a matter of first impression in this circuit. While Thomas argues that the critical inquiry

here should be whether the prior and instant offense are related, other courts do not agree. *See United States v. Walling,* 936 F.2d 469, 471 (10th Cir.1991) ("The question of 'related cases' referred to in § 4A1.2(a)(2), applies to the relationship between prior sentences, not to the relationship between prior sentences and the present offense."); *United States v. Garcia,* 909 F.2d 389, 392 (9th Cir.1990) ("There is no indication that the commentary [defining 'related cases'] was intended to define the words 'conduct not a part of the instant offense' in sec. 4A1.2(a)(1)."). We believe the critical inquiry is whether the prior conduct constitutes a "severable, distinct offense" from the offense of conviction. *United States v. Blumberg,* 961 F.2d 787, 792 (8th Cir.1992); *see United States v. Beddow,* 957 F.2d 1330, 1338 (6th Cir. 1992).

■ Thomas's argument rests solely on his assertion that some of the vehicles involved in his state conviction for theft, were also involved in his instant federal conviction for altering VINs. We do not agree. Though some of the vehicles that were part of Thomas's state indictments were involved in his *investigation* for the instant federal offense, none of the vehicles were made part of Thomas's *indictment and conviction* in the district court.[7] Thus, because Thomas's convictions for theft and altering VINs involve distinct offenses with different elements, and the convictions for each offense involve different vehicles, this court finds no error in the district court's application of section 4A1.2(a)(1).

■ Thomas further maintains that the district court erred in calculating his base offense level by considering loss, rather than retail value, in applying and interpreting U.S.S.G. §§ 2B6.1 and 2F1.1. We review the district court's interpretation of the sentencing guidelines de novo. *See United States v. Singleton,* 946 F.2d 23, 24 (5th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1231, 117 L.Ed.2d 465 (1992).

---

**6.** *See* United States Sentencing Commission, *Guidelines Manual* (Nov. 1991).

**7.** *See* Record on Appeal, vol. 6, at 16–17 (cross-examination of Cliff Babbitt).

This issue arises out of the difference between retail value and loss, as used by the guidelines in calculating base offense levels. According to section 2B6.1, a district court may increase a defendant's offense level by the corresponding number of levels from the table in section 2F1.1, if the *retail value* of the motor vehicles exceeded $2,000. However, the table in section 2F1.1 provides that if "the *loss* exceeded $2,000, increase the offense level" according to the amount of loss.

Thomas argues that the district court should have used retail value, rather than loss, in applying section 2B6.1 to section 2F1.1. We do not agree. Section 2B6.1 of the guidelines clearly directs a district court, upon finding that the retail value exceeded $2,000, to use the *amount of loss* in applying the loss table in section 2F1.1. Nowhere in sections 2B6.1 or 2F1.1, or their Commentary, does it mention using *only* retail value in applying the loss table in section 2F1.1. Therefore, we find no error in the district court's consideration of loss in applying section 2B6.1 to section 2F1.1.[8]

■ Thomas also argues that the district court erred in arriving at an estimation of loss, by considering the incidental costs incurred by insurance companies, victims, and innocent purchasers. We review for clear error, as the issue before the court involves the application of the guidelines to the facts. *See Shano*, 955 F.2d at 294.

■ The Commentary to section 2B1.1 defines loss as being the market value of the property taken. Only where ascertaining market value is impractical, *may* a court measure loss in some other way.[9]

After reviewing the record, we find that the retail value of the vehicles involved was neither difficult to ascertain or inadequate to measure harm to the victim. Babbitt testified, without objection, that the average cost for each vehicle "would probably be somewhere in the neighborhood of $20,-000." *See* Record on Appeal, vol. 6, at 16 (cross-examination of Cliff Babbitt). Both parties accept this $20,000 figure as a reasonable approximation of the retail value of each vehicle. *See* Brief for Thomas at 19–20; Brief for United States at 29. Since retail value was a practical measure of loss, we find that the district court clearly erred by considering incidental costs before retail value.

■ The government, however, argues that because 30 cars were involved at $20,-000 each (30 × $20,000 = $600,000), Thomas's argument is moot since his sentence was based on a finding that total loss fell between $350,000 and $500,000. *See* Presentence Report ("PSR") at 3; Record on Appeal, vol. 6, at 18. Accordingly, the government contends that even if the district court erred in estimating loss, defendant suffered no harm. We agree, and find a remand unwarranted. *See Williams v. United States*, —— U.S. ——, 112 S.Ct. 1112, 1120–21, 117 L.Ed.2d 341 (1992) ("[A] remand is [in]appropriate ... [where] the reviewing court concludes, on the record as a whole, that the error was harmless.").

■ A district court must consider a defendant's relevant conduct in calculating a base offense level.[10] U.S.S.G. § 1B1.3. Babbitt testified, without objection, that 30 vehicles were involved in Thomas's VIN-switch scheme. *See* Record on Appeal, vol.

8. Our decision in *United States v. Patterson*, 962 F.2d 409 (5th Cir.1992), is not inapposite. There, we upheld the district court's use of retail value in applying section 2F1.1. *Id.* at 413–14. However, in applying this section, loss ordinarily is equated with retail value, unless the market value is difficult to ascertain or inadequate to measure harm to the victim. *See* U.S.S.G. § 2F1.1, comment. (n. 7) (cross-referencing to definition of loss in section 2B1.1).

9. The Commentary to section 2B1.1 defines loss as:
   [T]he value of the property taken, damaged, or destroyed. Ordinarily, when property is

taken or destroyed the loss is the fair market value of the particular property at issue. Where the market value is difficult to ascertain or inadequate to measure the harm to the victim, the court may measure loss in some other way, such as reasonable replacement cost to the victim.

10. A defendant's relevant conduct includes "all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of offense of conviction." U.S.S.G. § 1B1.3(a)(1). In addition, all harm that resulted from the acts or

6, at 12 (direct examination of Cliff Babbitt). Thomas did not contest this evidence during the presentence hearing. *Id.* Pursuant to section 1B1.3, we find that the district court properly considered these vehicles as part of Thomas's relevant conduct, for the purpose of calculating his base offense level. Addendum to PSR at 1A. Babbitt also testified, without objection, that the retail value of each of these vehicles was "somewhere in the neighborhood of $20,000." Record on Appeal, vol. 6, at 16 (cross-examination of Cliff Babbitt). This evidence is also uncontroverted. Thus, even if the district court had used retail value rather than incidental loss in applying section 2F1.1, the aggregate loss figure $(30 \times \$20,000 = \$600,000)$ would have been greater than the loss figure (between $350,000 and $500,000) actually used.[11] Accordingly, no remand is necessary. *Williams,* 112 S.Ct. at 1120–21.

### III

For the foregoing reasons, we AFFIRM.

---

omissions must be counted. U.S.S.G. § 1B1.3(a)(3).

**11.** The PSR states that only 24 vehicles were involved in Thomas' VIN-switch scheme. Addendum to PSR at 1A. However, at $20,000 per vehicle, the aggregate loss figure using retail value would still be between $350,000 and $500,000 $(24 \times \$20,000 = \$480,000)$.