# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 6, 2009

Charles R. Fulbruge III
Clerk

No. 08-50118

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

JAIME TORRES; ROBERTO TORRES; BLANCA TORRES

Defendants-Appellants

Appeals from the United States District Court
for the Western District of Texas
(2:06-CR-76)

Before REAVLEY, SMITH, and DENNIS, Circuit Judges.

PER CURIAM:[*]

Appellants, Jaime, Roberto, and Blanca Torres, jointly appeal from their convictions on drug-related charges and for conspiracy to launder money. Before their joint trial, the defendants sought to suppress evidence uncovered from a 2001 warrantless search of Jaime and Roberto Torres's parents' ranch. They also

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1

sought to suppress the results of a 2006 warrant-based search of Jaime and Blanca Torres's home. The district court denied both motions and appellants seek reversal on these grounds. Appellant Blanca Torres also seeks to have her conviction for money laundering under 18 U.S.C. § 1856(a)(1) & (h) set aside for insufficient evidence. Finally, each of the defendants requests we amend the district court's forfeiture judgment, entered under 18 U.S.C. § 982(a) and 21 U.S.C. § 853(p), arguing that the district court incorrectly multiplied the jury verdict from the forfeiture trial. As we hold that neither search violated the Fourth Amendment and that, based on the deferential standard of review, there was sufficient evidence for a reasonable jury to convict Blanca Torres, we affirm Appellants' convictions. Moreover, as all parties agree that the monetary forfeiture judgment entered by the district court was inconsistent with the jury verdict, we order that judgment be modified.

### *Background*

In early 2001, Adrienne Martinez, a United States Border Patrol Agent, located fresh footprints near the Texas-Mexico border. Thinking they were the prints of an illegal entrant, Martinez and another agent followed those tracks to the "Torres Ranch" property, owned and operated by the parents of Jaime and Roberto Torres, solely for commercial purposes.[2]

The ranch was fenced, so, without a warrant, the agents climbed the fence and entered the property. The smell of unburnt marijuana led the agents to a vehicle. The agents opened the trunk and discovered bundles of marijuana inside. Spurred by this discovery to look further, more marijuana

---

[2] Jaime Torres was charged with running the ranch and was allowed to use portions of the property for his own commercial ventures. However, he has asserted no ownership interest in any of the property the agents eventually searched on the grounds.

was uncovered in another, nearby, vehicle. The agents then hid on the property, waiting to see what else they would uncover. Eventually a truck arrived carrying two men, one of whom the agents were later able to identify as Jaime Torres. The men began to load the marijuana into their vehicle. Then another truck arrived. The agents, fearing that their hideout had been compromised, called for back-up. As other agents arrived, the two trucks fled with their occupants. No arrests relevant to this appeal were made at this time.

At the start of 2006, Immigration and Customs Enforcement Agent Noah Crist, who was assigned to the ongoing investigation of the Torreses' activities, submitted an affidavit as part of his application for a search warrant for Jaime and Blanca Torres's home.[3] In this affidavit Crist detailed facts dated from 1997 through 2001, including the results of the 2001 warrantless search of the Torres Ranch, suggesting the Torreses' involvement with drug smuggling and money laundering. The affidavit also detailed wild swings in the Torreses' income, going from $26,000 to $1.4 million; confidential informants describing the Torreses' involvement with smuggling routes; and that other members of the Torres family were arrested for drug trafficking in 2003. Moreover, Crist stated that based on this evidence he personally believed Jaime Torres was involved in illegal activities. As a result of this evidence, the Magistrate Judge granted the warrant. The resulting search of Jaime and Blanca Torres's home uncovered what the government later alleged was a ledger of drug transactions.

---

[3] Agent Crist prepared a number of affidavits as part of his investigation. Appellants make reference to several of these affidavits. However, it appears that their arguments on appeal turn on a single affidavit submitted at the start of 2006 and thus we focus our discussion on this affidavit.

Jaime and Roberto Torres were subsequently indicted on one count of violating 21 U.S.C. § 841(a)(1) & (b)(1)(A), intent to distribute more than 1,000 kilograms of marijuana, one count of violating 21 U.S.C. §§ 952(a), 960(a)(1) & (b)(1) and 963, conspiracy to import more than 1,000 kilograms of marijuana into the United States, and one count of violating 18 U.S.C. § 1956(a)(1) & (h), conspiracy to launder monetary instruments. Blanca Torres was indicted only on one count of violating 18 U.S.C. § 1956(a)(1) & (h). The defendants filed joint motions to suppress the evidence uncovered during the searches described above and the district court denied their motions.

During their trial, among other evidence, the government presented testimony from a number of alleged co-conspirators in the drug smuggling operation, as well as the testimony of Juan P. Garza, who stated that he laundered money for Jaime Torres. Moreover, the government showed that Blanca Torres was the sole signatory on her and Jaime Torres's business bank account, which the government alleged contained deposits from the drug smuggling operations. The government also demonstrated that Blanca made deposits of several large sums from Juan Garza, without providing him the services for which those payments were nominally made. In addition, it showed Blanca made numerous large purchases from these accounts, living well outside the income Jaime Torres claimed he received from their legitimate business activities just a few years earlier, $23,000, including buying several properties, a Rolex watch, and carrying over $11,000 in cash. Blanca Torres's only defense was that she lacked control over her husband's business decisions. The other defendants' witnesses and arguments are not at issue on appeal.

4

Each of the defendants was convicted on all counts. Subsequently, the court held a forfeiture trial in which the jury determined that $750,000 was traceable to the defendants' conspiracies. The district court later entered a monetary judgment, holding them jointly and severally liable for forfeiture of $2,250,000, appearing to multiply the $750,000 verdict by the number of defendants.

Appellants timely appealed their convictions, arguing that the evidence from the 2001 and 2006 searches should have been suppressed and Blanca Torres claimed her conviction was based on insufficient evidence. Moreover, the appellants collectively moved to have the district court's forfeiture judgment modified to reflect the jury's verdict.

### *Discussion*

*Appellants' Fourth Amendment Claims*

In reviewing the denial of a motion to suppress, "'we review the district court's factual findings for clear error and its legal conclusions, including its ultimate conclusion as to the constitutionality of the law enforcement action, *de novo.*'" *United States v. Reyes*, 349 F.3d 219, 222 (5th Cir. 2003) (quoting *United States v. Chavez*, 281 F.3d 479, 483 (5th Cir. 2002)). Of particular relevance to applying this standard to this case, we have held that "[w]hether a defendant has standing to contest an allegedly illegal search is a question of law." *United States v. Ibarra*, 948 F.2d 903, 906 (5th Cir. 1991) (citing *United States v. Kye Soo Lee*, 898 F.2d 1034, 1037 (5th Cir. 1990)).

*The 2001 Search*

The 2001 search of the Torres Ranch is best conceptualized as raising two potential Fourth Amendment violations, first the agents' entry onto the

property and second the search of the vehicles. Yet both of these Fourth Amendment concerns can be dismissed as the defendants lacked the reasonable expectation of privacy necessary to have standing to challenge these searches. *See United States v. Gomez*, 276 F.3d 694, 697 (5th Cir. 2001) ("Whether there is standing to contest the validity of a search 'depends on (1) whether the defendant is able to establish an actual, subjective expectation of privacy with respect to the place being searched or items being seized, and (2) whether that expectation of privacy is one which society would recognize as reasonable.'" (quoting *Kye Soo Lee*, 898 F.2d at 1037-38))).

The defendants lacked standing to challenge the agents' entry, and decision to remain, on the property because of the "open fields doctrine." The Supreme Court and this Circuit have recognized the stark distinction between an "open field" and the "curtilage" of the home. "Open fields are protected neither under the text of the Fourth Amendment nor under the conception of the Amendment." *United States v. Pace*, 955 F.2d 270, 274 (5th Cir. 1992) (citing *Katz v. United States,* 389 U.S. 347 (1967)). They, by their very nature, lack the social significance to create an objectively reasonable expectation of privacy in the property.

When determining whether an area is an open field or curtilage, the Court has stated, "the central component of this inquiry [is] whether the area harbors the 'intimate activity associated with the "sanctity of a man's home and the privacies of life.""" *United States v. Dunn*, 480 U.S. 294, 300 (1987) (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)). The Court then went on to list four factors that should be considered in this analysis, "the proximity of the area claimed to be curtilage to the home, whether the area is

included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *Id.* at 301.

Based on this analysis, the Torres Ranch must be viewed as an open field. The ranch was a commercial property separate and distinct from the Torreses' family home, not used for any form of domestic activity and protected only by a scalable fence. Thus, the property was distinguished from anything that could be characterized as typically containing the intimate activities of a private home. Accordingly, no individual could claim a reasonable expectation of privacy in the property. Without such an expectation the defendants do not have standing to raise a Fourth Amendment challenge to the agents' warrantless entry.[4]

The defendants likewise lack standing to challenge the search of the vehicles on the ranch. To determine whether any of the defendants had a constitutionally protected expectation of privacy in this property this court has said a number of factors must be weighed "includ[ing] whether the defendant has a possessory interest in the thing seized or the place searched, whether he has the right to exclude others from that place, whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his

---

[4] Such a conclusion is further supported by this court's holding in *Pace.* In *Pace*, two officers searching for drugs entered onto a property by one of them "squeezing through a gap between the main gate and a fence post and the other by climbing over the gate." *Pace*, 955 F.2d at 273. While searching the property they "crossed at least two more gates" to look for signs of illegal activity. *Id.* The court found that none of this conduct posed a constitutional concern, as it was merely an exercise of the officers' "privilege[] to stand in the open field." *Id.* at 275.

privacy and whether he was legitimately on the premises." *United States v. Haydel*, 649 F.2d 1152, 1155 (5th Cir. 1981).

As with the agents' entry onto the Torres Ranch, each of the factors weighs against finding the defendants had a reasonable expectation of privacy in the cars. Both of the cars belonged to Jaime and Roberto's parents, and none of the defendants had any sort of possessory interest in the vehicles; the record provides no indication that the defendants were empowered to use the cars for any purpose, thus the record suggests that the defendants had no authority to exclude others from using the vehicles; and the defendants did not lock the vehicles' trunks nor attempt to move the cars to a secluded location, defeating any suggestion that they had a subjective expectation of privacy or took normal precautions to ensure the vehicles would remain private. Accordingly, we conclude that the defendants did not have a constitutionally protected expectation of privacy in the vehicles or their contents.

As a result, because we find the defendants lacked standing to challenge the 2001 search, we affirm the district court's denial of the defendants' motion to suppress.[5]

*The 2006 Search*

Appellants also argue that the search warrant for the 2006 search of Jaime and Blanca Torres's home lacked probable cause and thus the fruits of that search should be suppressed. In particular, they suggest that the affidavit supporting the warrant was deficient because it relied on stale and

---

[5] The government raised a number of other bases on which we could conclude that the search was constitutional. We do not reach these arguments as we find the initial step of the Fourth Amendment inquiry, standing, foreclosed to Appellants.

irrelevant evidence and that the officer applying for the warrant made omissions and deliberately deceived the court as to the basis of his belief that the Torreses' were engaged in criminal activity. Yet, assuming *arguendo* that Appellants' claims are correct and render the warrant unsupported by probable cause, the fruits of the search still fall cleanly within the "good faith exception" to the exclusionary rule, creating a basis upon which to uphold the district court's ruling.

Under the good faith exception, "[i]f an officer's 'reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues [is] objectively reasonable,' a court need not suppress the fruits." *United States v. Flanders,* 468 F.3d 269, 271 n.2 (5th Cir. 2006) (quoting *United States v. Leon*, 468 U.S. 897, 922 (1984)) (second alteration in original). Generally, we presume that it is objectively reasonable for an officer to execute a warrant. *See United States v. Pope,* 467 F.3d 912, 916 (5th Cir. 2006) (endorsing a district court's statement that only in "exceptional circumstances" does the good faith exception not apply to the execution of a warrant). However, this court has recognized four primary situations where this presumption will be overcome and the good-faith exception will not be applied to an officer's execution of a warrant:

> i. when the magistrate or state judge issues a warrant in reliance on a deliberately false affidavit;
> ii. when the magistrate or state judge abandons his or her judicial role and fails to perform in a neutral and detached fashion;
> iii. when the warrant is based on an affidavit so lacking in indicia of probable cause as to render an officer's belief in it unreasonable; and
> iv. when the warrant is so facially deficient that it fails to particularize the place to be searched or the items to be seized.

9

*Id*. at 916-17 (citing *Leon,* 468 U.S. at 914). Appellants' arguments seek to characterize the 2006 search as falling into either the first or third circumstance. However, to overcome the presumption of reasonableness both these exceptions-to-the-exception have their own requirements and we find them unsupported by the evidence in this case.

Regarding the first circumstance, to suppress evidence because a warrant omitted or mischaracterized relevant information, this court has determined such an error must be shown to have been "knowingly and intentionally made or [] made in reckless disregard for the truth." *United States v. Cronan*, 937 F.2d 163, 165 (5th Cir. 1991); *see also United States v. Martin*, 615 F.2d 318, 329 (5th Cir. 1980) ("a proven misstatement can vitiate an affidavit only if it is established that the misstatement was the product 'of deliberate falsehood or of reckless disregard for the truth'" (quoting *Franks v. Delaware*, 438 U.S. 154, 171 (1978))). As these are factual predicates to applying the legal standard of the good faith exception, we review the district court's determination for clear error. *See United States v. Looney*, 532 F.3d 392, 395 (5th Cir. 2008), *cert. denied*, 129 S. Ct. 513 (2008).

Appellants allege that the affidavit supporting the warrant omitted information about the Torreses' legitimate business operations—potentially explaining the suspicious transactions and deposits described in the affidavit—and other searches of the defendants' property—which had failed to uncover evidence of illegal activities. Moreover, they argue that Crist misled the court to believe that the Torreses were engaged in illegal activities, by stating his personal conclusion that they were engaged in unlawful activities, which relied on out-of-date evidence and an inappropriate

10

assumption that their relatives' illegal activities indicated their involvement in drug trafficking. However, Crist included with his affidavit information about Jaime and Blanca Torres's tax returns, which he noted reported income, presumably from legitimate sources. Thus, the agents' failure to restate this potentially exculpatory information did not make out the requisite *mens rea*. Moreover, Appellants fail to introduce any evidence that would suggest Crist intended to or believed he was likely misleading the court as to the basis for or strength of his belief that the Torreses were engaged in criminal activity. Accordingly, we find the district court committed no clear error in determining that the alleged omitted or misstated information was not shown to be intentionally or recklessly placed in the affidavit and therefore in applying the good faith exception.

The third circumstance where the good faith exception may not apply is if a warrant is unreasonably based on a "bare bones" affidavit. *United States v. Cordero*, 465 F.3d 626, 630 (5th Cir. 2006). Appellants raise the specter of this exception by arguing that the 2006 affidavit relied on stale information. To determine whether "stale" information in an affidavit makes a search fall outside the good faith exception, this court has said that the proper inquiry is whether the staleness caused the warrant to be "so deficient that no reasonable officer could have believed that it established probable cause." *United States v. Craig*, 861 F.2d 818, 821 (5th Cir. 1988). As this is also a factual predicate to applying the exception-to-the-exception, we again review the district court's determination for clear error. *See Looney*, 532 F.3d at 395.

As described above, Agent Crist's affidavit detailed not only facts from 1997 to 2001, indicating the Torreses were engaged in illegal activities, but

11

also income statements from 2006, showing vast and unexplainable influxes of money and statements of confidential informants confirming Roberto and Jaime Torres's involvement with smuggling routes. Given the breadth and variety of this information, spanning numerous years and demonstrating a series of grounds to believe the Torreses were involved in illegal activities, we cannot say that it was clear error for the district court to conclude a reasonable agent could believe the warrant was issued based upon a sufficient affidavit.

Therefore, as the state is entitled to the fruits of a search conducted in "good faith," we affirm the district court's denial of the motion to suppress.

*Blanca Torres's Sufficiency of the Evidence Claim*

When considering a sufficiency of the evidence claim, "'we determine whether a reasonable jury could find that the evidence establishes the guilt of the defendant beyond a reasonable doubt,' viewing the evidence in the light most favorable to the government and with all reasonable inferences and credibility choices made in support of a conviction." *United States v. Harris*, 566 F.3d 422, 435 (5th Cir. 2009) (quoting *Williams,* 507 F.3d 905, 908 (5th Cir. 2007)).

Blanca Torres was convicted of conspiracy to launder money. To prove this crime at trial, the government must "show that [the defendant] knowingly conspired with at least one other person to (1) conduct or attempt to conduct a financial transaction; (2) with the knowledge that it involved proceeds of specified unlawful activity (here controlled substance offenses); and (3) with the knowledge that the transaction was designed in whole or in part to conceal the nature, source, ownership, or control of the proceeds, or to

12

avoid a federal or state reporting requirement." *United States v. Fernandez,* 559 F.3d 303, 313 (5th Cir. 2009), *cert. denied*, 129 S. Ct. 2783 (2009) (parenthetical in original). In making out these elements this court has stated that "[d]irect evidence of a conspiracy is unnecessary; each element may be inferred from circumstantial evidence." *United States v. Casilla*, 20 F.3d 600, 603 (5th Cir. 1994).

As described above, the evidence against Blanca Torres went almost entirely uncontested and provided strong circumstantial inferences that she was involved in laundering money from unlawful activities. The government showed that Blanca Torres's husband and brother-in-law were intimately involved in large scale drug trafficking; that Blanca transacted directly with a man involved in her husband's money laundering operation for these drug transactions, providing him monies for purchases the government alleged, and Garza testified, were part of the laundering scheme and receiving money back from him nominally for services, which were in fact never provided. Moreover, the government showed that she made purchases that were well outside the declared income provided by her and her husband's legal business operations. Thus, the government has brought forth direct evidence that Blanca Torres engaged in financial transactions and sufficient circumstantial evidence that she was aware that her transactions with Garza were part of her husband's money laundering connected to his illegal transactions and distinct from her lawful business operations. At the same time, Blanca did not offer any explanation, let alone a compelling one, for why she could have concluded these transactions were part of anything but her husband's illegal operations. Her defense of ignorance does not defeat the reasonable

inferences that conceivably could have been drawn from her actions and contacts. True, the evidence is far from compelling. However, taking all the inferences created by this evidence in the light most favorable to the government, as we are required to do, we cannot say it is unreasonable for a jury to have concluded that Blanca Torres was guilty of money laundering. Accordingly, we affirm Blanca Torres's conviction for conspiracy to launder money.

*The Forfeiture Judgment*

After a special forfeiture trial, the jury determined that $750,000 was traceable to the conspiracies charged. All parties agree that this was the entirety of the jury's verdict. Accordingly, the monetary judgment the district court entered against the defendants, seemingly multiplying the jury verdict by the maximum number of defendants—leading the court to hold the defendants jointly and severally liable for $2,250,000—was in error. Thus, we modify the district court's order on the basis of plain error. *See*, *e.g.*, *Sparks v. Baxter*, 854 F.2d 110, 115 (5th Cir. 1988) (modifying judgment on appeal for plain error); *Cage v. Cage*, 74 F.2d 377, 378 (5th Cir. 1934) (same).

## *Conclusion*

For these reasons, the appellants' convictions are AFFIRMED, and the district court's forfeiture judgment is amended to reduce the amount for which Jaime, Roberto, and Blanca Torres are held jointly and severally liable to $750,000, and, as amended, is AFFIRMED.